## THE STATE v. GREGORY, Appellant.

### Division Two, November 12, 1900.

1. **Reputation:** CROSS-EXAMINATION: GENERAL OBJECTION. One Wilson was called as a witness for defendant in a murder case to prove the general bad reputation of deceased for peace and quietude, and the prosecuting attorney on cross-examination asked him the question: "Isn't it true, that he was a splendid, good man, and so recognized by the best people of that country?" To which defendant made a general objection, without assigning any reason for his objection. The court permitted the witness to answer. He said, "Yes, he was by me." *Held,* not error.

2. **Instructions:** OBJECTIONS ON APPEAL. It is too late to make objections to instructions given by the court of its own motion for the first time in the appellate court. Exceptions must be saved at the trial.

3. ————: COVERED BY OTHERS: SELF-DEFENSE. Where the court has given correct instructions which cover every principle announced in those refused, such refusal is not error.

4. **Separation of Jury:** Four of the jurors desired to go to the water closet, and the sworn deputy in charge of the jury called the other officer and left the eight jurors in their room locked up, and the officer on guard, and took the four to the closet and remained with them until they had accommodated themselves, and then returned them to their room. No one communicated with them on their way to or from the closet. *Held,* that this was no such separation of the jury as the law forbids.

Appeal from Dunklin Circuit Court.—*Hon. J. L. Fort,* Judge.

AFFIRMED.

*W. R. Hall* and *J. P. Tribble* for appellant.

(1) The court erred in permitting witness Wilson to answer the question in reference to the character of deceased,

as follows: "Isn't it true, Mr. Wilson, that Joseph Covert was a splendid good man and so recognized by the best people of that county?" His answer being: "He was by me." This was not the proper manner of establishing good character or of contradicting proof of bad character. Opinions of the witness are not admissible. Waddingham v. Hulett, 92 Mo. 528; 1 Greenl. on Evid., sec. 461. (2) It was error for the court to refuse to permit witness Higginbotham to testify to the reputation given deceased, Covert, by those with whom he had conversed about it. It was a matter of legitimate inquiry, and each individual witness is not required to testify as to the reputation of a man among all his neighbors. Part may be proved by one and part by others, the combined testimony of all going to establish his general reputation among his neighbors. State v. Brandenburg, 118 Mo. 181; State v. Grate, 68 Mo. 22. (3) Instruction 6 is erroneous (a) It does not give a proper definition of self-defense—in fact no definition of self-defense at all—but merely suggests a portion of the negative element of that defense. The court should, in all cases, follow approved precedents in preparing instructions on well settled points. State v. Kilgore, 70 Mo. 557; State v. Murray, 91 Mo. 99. (b) It comments on the testimony; this is forbidden by law. R. S. 1899, sec. 2639; State v. Homes, 17 Mo. 379; State v. Dunn, 18 Mo. 419; State v. Sivils, 105 Mo. 530; State v. Fairlamb, 121 Mo. 137. And the fact that the comment may have been correct does not cure it of its vice. Jones v. Jones, 57 Mo. 139; Miller v. Marks, 20 Mo. App. 369. (c) Besides it declares an incorrect proposition of law. The defendant has a right to act on appearances. This was here denied him. (4) It is self-contradictory in telling the jury if they "believed defendant guilty of either murder in the first or second degree, and entertained a doubt as to which of said degrees defendant was guilty, they would give him

the benefit of such doubt and find him guilty of murder in the second degree." State v. Grayor, 89 Mo. 600. Such instruction is prejudicial to the defendant and unauthorized by law. State v. Martin, 124 Mo. 522.

*Edward C. Crow,* Attorney-General, and *Sam B. Jeffries,* Assistant Attorney-General, for the State.

Wilson was not the State's witness; he was not put upon the stand for the purpose of establishing the good character of the deceased; he was not being examined upon matters which he had not been previously examined upon in chief, and the State was not primarily attempting to prove by him that deceased was a man of good character. The questions propounded to him on cross-examination were asked for the purpose of discovering and disclosing the extent of the witness's knowledge of the general reputation of the deceased in the neighborhood in which he lived. Nor can it be said that the question was for the purpose of contradicting proof of bad character, but was asked for the purpose of discrediting the testimony of the witness and enabling the jury to determine the exact weight that should be given his testimony. Nor was the question such as would call from the witness his opinion of the character of deceased. It went solely to the general reputation which the deceased had in the community in which he lived, so far as being a splendid, good man was concerned. The words "splendid, good man" necessarily include his reputation as a peaceable and law abiding citizen, and was, in every particular, a competent question on cross-examination. Character, as used in the law and evidence, is the opinion generally entertained of a person, derived from the common report of the people who are acquainted with him. Bouvier's Law Dictionary, 300; State v. Smith, 88 Ala. 73; State v. Turner, 36 S. C. 534.

GANTT, P. J.—From a conviction of murder in the first degree, the defendant appeals to this court. The homicide occurred in Dunklin county, Missouri, in which both deceased and defendant resided at the time.

Joseph Covert, the deceased, was a member of the firm of Covert & Hill, who were in the lumber business, and owned in his own right a small store near the mill yard. The defendant is a married man, about 24 years old. Some days prior to the killing of deceased by defendant, the defendant had contracted to cut some logs for deceased and had purchased a few articles from deceased, and not having the money, pledged a silverine watch, valued at $3, as security for the goods he purchased. On the 20th of February, 1899, the defendant, his younger brother and his father were hunting in the neighborhood of the store, when the defendant and his brother left their father and came over to the mill. The defendant carried his Winchester rifle with him and when he reached the mill, went into the engine or boiler room and inquired of Ferrell, one of the workmen, where his watch was. Ferrell told him it was hanging upon the post where the fireman was. Thereupon defendant said, "I am going to get that watch, and if Mr. Covert kicks I aim to shoot him like shooting a G—d d—n rabbit."

Defendant went in, got the watch, and put it in his pocket. He then started to the store, but before reaching it, overtook Mr. Covert, the deceased, who went to the store with him. John Wortham, one of the hands, saw defendant take the watch and went over to the store to tell Covert. When he got there, Covert was busy, and witness asked defendant if that was his watch sure enough, defendant said it was, and pulled it out of his pocket, whereupon deceased remarked, "You had better let it alone until this is settled." The evidence of several witnesses tended to show that when defendant and deceased went into the store, the deceased,

Covert, got the account book.   The amount of the account was shown by defendant to be $1.35, and that upon the settlement deceased owed him 11 cents, but deceased wanted to hold the watch until a wedge valued at 35 cents had been paid for.   Defendant contended that this was not a part of the goods for which the watch was pawned.   About the time the statement of the account was handed deceased by defendant, one George Moran came into the store and called for some chewing tobacco.   Covert waited on him, and walked along the counter to the end when he turned, and this brought him facing defendant and some others who were in the store, and about eight feet from defendant.   Defendant then said to Covert, "If you don't stop, I will shoot you." Covert said, "No, you won't," and about that time Covert stopped and defendant shot him.   The deceased fell with his head at the door and his feet toward the counter.   There was evidence also that deceased was in a good humor and was making no demonstration against defendant when he was shot.

Breeden testified that about two weeks prior to the homicide, Gregory, the defendant, said he was going to cut logs for two days and then demand his watch, and if he didn't get it he was going to shoot Covert.

Harry Schick testified that he asked Gregory on the day of and before the homicide, why he was not cutting logs, and defendant answered, he didn't intend to cut any for a while, but he intended to have his watch or beat Covert up.

McIntosh testified that after the shooting he saw Covert lying in the door, and defendant with his gun in his hand. Some one remarked to defendant it was a bad piece of business and defendant said, "Yes, I killed him.   I told him I would kill him, and I killed him.   They can do as they please; they can put the rope around my neck."

Ed Wilkes testified to a similar statement.

Dr. A. S. Harrison, the coroner, testified that he held a postmortem examination on the body of Joseph Covert, the deceased, and found a gun shot wound on the right side of the neck, passing backward, striking the spinal column in the region of the neck, fracturing some of the spinal vertebrae, passing downward and striking the shoulder blade, and glancing from there, striking the spinal column again and lodging under the skin near the spinal column on the right side. That it was a mortal wound sufficient to produce instant death.

On the part of defendant, his wife and Elizabeth Black testified that on one occasion deceased was passing the home of defendant's father and stopped to get a drink of water at the well near the road, and Mrs. Gregory, wife of defendant, was drawing water for herself; that defendant got his drink and then commenced talking to her. He said he was going up to where he was raised, and wanted her to go with him. She told him "No, sir; she couldn't go." He then said he liked her better than any woman he ever saw, and he intended to have her if he had to kill Milo. These witnesses both swear they never told defendant of this conversation, nor mentioned it to any one until after the homicide.

J. O. Wilson testified on his direct examination that he knew the general reputation of deceased for peace and quietude, and it was bad. This witness was cross-examined as to the persons who had given deceased a bad reputation for quietude and peace, and he named three who said he was overbearing and crabbed to his workmen. He was then asked this question: "As a matter of fact, he was a splendid, genuine man, and was so recognized by the people of that country; wasn't he, Mr. Wilson?" To which defendant objected without assigning any reason. The court permitted the witness to answer, and he answered, "Yes, sir; he was. I can say that much."

State v. Gregory.

One other witness was called for the same purpose, but could not qualify himself to speak as to the general reputation of deceased.

The only witnesses who testified on behalf of defendant to the circumstances attending the shooting were the defendant and his half brother, a boy about fifteen years old. They corroborated each other and the other witnesses as to the settlement of the account and the fact that Moran came in and interrupted the settlement by calling for some tobacco. They differ in their story, from Moran to some extent.

Defendant says that deceased figured up his account and it showed that his log account had overpaid the merchandise he had bought, eleven cents. Defendant says he then said to deceased, "Mr. Covert, that makes the watch mine," and he said, "Yes." Then Moran came in and as he turned to wait on Moran, Covert said, "No, there is an iron wedge, I forgot. I will charge you 35 cents for that wedge you got at Jim Breeden's," whereupon defendant says, "I calculated to bring that wedge home before now. It is through negligence. I didn't know it was yours at all." Covert says, "You know it now; that watch will not leave here." After he waited on Moran, defendant said to deceased, "Mr. Covert, I am going to take my watch," and Covert answered, "Yes, and I will hurt you and hurt you d—n bad, before you get out of here." "With those remarks, we both made a dash for the door. . . As he came round the corner he says, 'I will break your d—n neck,' and we were about six or seven feet from each other. I had my rifle in my hand and I said, 'Don't come on me, Mr. Covert, or I will shoot you. He says, 'Shoot hell, you ain't got nerve enough to shoot nothing.' I says, 'Yes, I will, stop or I will shoot you.' He kept advancing and I going back. . . . I raised my gun higher and says, 'By G—, Covert, you better stop or I will shoot you.' He says, 'Shoot and be damned,' and I shot

Vol. 158 .mo—10

him." The evidence tended further to show that defendant was a small man, deceased a large, tall man of great strength.

Defendant contradicted each and all of the witnesses as to threats against deceased. A number of grounds are relied on for a reversal, and they will be examined and considered.

I. It is urged as error that the court permitted the prosecuting attorney on the cross-examination of J. O. Wilson, a witness who had been called to prove the general bad reputation of deceased for peace and quietude, to ask said witness this question (at the close of the examination for the purpose of testing his knowledge as to such reputation): "Isn't it true, Mr. Wilson, that Joseph Covert was a splendid, good man, and so recognized by the best people of that country?" The court permitted the witness to answer, and he said, "He was by me."

The objection was general. No ground of objection whatever was stated. It must be borne in mind that this witness, the only one by the way, who had testified that the general reputation of deceased for peace and quietude was bad, was under cross-examination as to his knowledge of the reputation of deceased. He had finally answered that three persons had spoken to him about deceased and said he was "overbearing" and "crabbed with his men," and at the conclusion of his examination, had volunteered that deceased had always treated him right, and thereupon the prosecuting attorney propounded the question above mentioned. The inquiry by the defendant placed the character of deceased as a peaceable, law-abiding citizen in issue, and it was competent *on cross-examination* to elicit from defendant's witness the fact that deceased was considered a splendid man by the good people of his neighborhood. We think no reversible error was committed by permitting the question.

If the best people of his county considered deceased a splendid, good man, this was one way of saying his reputation was good as a peaceable, law-abiding citizen.

II.   It is too clear for discussion that no error was committed in ruling that Higginbotham was not qualified to speak as to the general reputation of deceased.   The court and counsel instructed him fully as to what constituted general reputation and he answered he could not answer yes or no, as to his knowledge.   He was properly excluded.

III.   The instructions given by the court of its own motion were not objected to and no exceptions were saved thereto.   It is too late to make objections to these instructions for the first time in this court.

The only exception to instructions was taken to the refusal of two instructions asked by defendant and refused by the court.   No exception was taken to the failure of the court to instruct upon all questions of law arising in the case. There was no error in refusing the first instruction asked by the defendant.   The court had already given an instruction on self-defense which covered every principle announced in these instructions, and to which no objections had been made, and when this is the case it is not error to refuse other instructions even though they embody correct principles of law.

The second instruction, moreover, was erroneous in that it failed to leave to the jury to find that there was reasonable cause for the defendant to apprehend that deceased was about to kill him or do him great bodily harm, and that the danger that he was about to do so was imminent and impending.

IV.   Among other grounds for a new trial a separation of the jury is alleged.   The facts are these:   Four of the jurors desired to go to the water closet, and the sworn deputy in charge called the other officer and left the eight jurors in their room locked up and an officer on guard and took four to

the closet and remained with them until they were accommo-
dated and then returned them to their room.   No one com-
municated with them on their way to or from the closet.
That this was not a separation within the meaning of the law
is now settled in this State.   In State v. Murray, 91 Mo. loc.
cit. 103, SHERWOOD, J., said, "If any imperious necessity de-
mands that a juror withdraw from his fellows, in order to
answer a call of nature, and this withdrawal is done under
official supervision while the remaining jurors are securely
locked in their room, this would be in spirit and reason, if
not in the letter, a compliance with the law."   [State v.
Sprague, 149 Mo. loc. cit. 425.]

V.   The contention that the verdict is not sustained by
the evidence is without merit.   The conduct of the defendant
throughout is most reprehensible.   He began by possessing
himself of the watch he had pledged for his debt to deceased,
without any color of right.   Moreover, he had announced
two weeks before the homicide that he proposed to have the
watch or shoot deceased.   The great burden of the evidence
is that he came armed with a deadly weapon to settle a trifling
account; that without any provocation he threatened to shoot
deceased.   The disinterested evidence shows that deceased
was in the best of humor, and that defendant began by order-
ing deceased to stop walking in his own store, and at a time
when he was making no demonstration of violence toward de-
fendant.   Considering the whole conduct of defendant, his
threats without occasion therefor, the trifle involved, and his
shooting an unarmed man under the circumstances, the hom-
icide can not be regarded as anything less than a wilful delib-
erate murder, and so the jury have pronounced it.

We see no reason for reversing the judgment, and it is
accordingly affirmed, that the sentence which the law pro-
nounces may be executed.   *Sherwood* and *Burgess, JJ.*, con-
cur.