PRICE VANDURAN v. THE STATE.

No. 3664.   Decided November 28, 1906.

**Murder—Manslaughter—Misconduct of Jury.**

Where upon trial for murder, the defendant's reputation had not been placed in issue, and the record showed that the jury in their retirement had discussed the reputation of defendant as being a bad negro, and that he had been sent to the county convict farm, there was such misconduct of the jury as to constitute reversible error.

Appeal from the District Court of Walker. Tried below before the Hon. Wells Thompson.

Appeal from a conviction of manslaughter; penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*A. G. Lipscomb* and *W. J. Poole,* for appellant.— Felsenthal v. State, 30 Texas Crim. App., 676; Taylor v. State, 27 Texas Crim. App., 463.

*J. E. Yantis,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—Conviction was for manslaughter, punishment being assessed at three years confinement in the penitentiary.

After the retirement of the jury, they reached a conclusion that appellant was guilty. They were divided on the punishment, ranging perhaps from six or seven years down to two. On motion for new trial the misconduct of the jury is alleged, and it is shown by Jake Galewsky (one of the jurors) that during their deliberation, the jury was discussing the bad character of the deceased Johnnie James, in connection with the guilt or innocence of the defendant. One of the jurors, John Mills, remarked in reply that defendant, Price Vanduran, was a bad negro; and that he had been sent to the county farm, and that he had guarded appellant on the county farm. It is further shown, while the jury were in their retirement, that the court informed the jury that if they did not reach a verdict before

5 o'clock he would have to leave and be gone until Monday morning. After the jury had been out for several hours, Wright McDade, deputy sheriff in charge of the jury, informed them that the judge said it was only thirty minutes until train time, and if they did not get a verdict by that time, he was going to Houston, and from there to Dallas, and would not be back until Monday morning, and the jury would have to be kept together and locked up until Monday morning; that this juror was at first in favor of an acquittal, and if he could not get defendant acquitted, he was for the lowest penalty for manslaughter—two years; that he and others contended for two years, until the message was brought them by the deputy sheriff McDade; that he was in the mercantile business in Hempstead; the next day was Saturday, and large crowds of people usually came to Hempstead to trade on Saturday and he could not afford to be away from his business that day. Rather than be locked up and kept away from his business until the next Monday he was forced to agree to a verdict of three years instead of a verdict for two years. Some of the other jurors were contending for three years.

Juror Weir stated that after they had retired, John Mills, also a juror, in the presence and hearing of the jury, remarked that Price Vanduran was a bad negro; that he had been convicted and sent to the county farm, and that he had guarded him on the county convict farm. This juror remonstrated with Mills for making such remarks to the jury. There was a great deal of testimony in regard to this from the jurors; and a bill of exceptions was reserved, embodying the facts in a general way that occurred in the jury room. This bill shows that while the jurors were discussing the bad reputation of the deceased, Mills remarked in reply that defendant was a bad negro and had been sent to the county farm, and he had guarded him on the county farm. This was shown also by an affidavit. The State's attorney asked for a postponement until the next day, so as to send for the juror Mills. The court remarked that if Mills made said statement in the jury room, he would fine Mills. This was on the 24th, and on the morning of the 25th, Mills was brought into court and testified: "When we retired to consider our verdict, we were first placed in the sheriff's office, and all agreed upon a verdict of guilty; that defendant was guilty, but that we differed as to punishment. Some wanted to give appellant five years, and some three years, and one juror, Galewsky, only wanted to give him two years. They were then carried upstairs into the grand jury room, and while there they were discussing the bad character of the deceased. He remarked, in fun, "that I had seen defendant at work on the county convict farm. I was riding the mail. I did not say that he had been convicted; nor did I say that the defendant was a bad negro. I made the remark that I had seen defendant on the county farm before we had agreed on our verdict in the case. After I made the remark, Jake Galewsky, agreed to the three years' punishment instead of two." The

presiding judge signs this bill with the qualification, that the statement made by the court was after the hearing of the motion for new trial had been postponed from the evening of the 24th to the morning of the 25th, and was made after the court had left the bench, and was preparing to go to the hotel, and was made casually to the lawyers present. No exception was taken at the time, and it was the next day that counsel for the defense notified the judge that they desired a bill of exceptions to the remark. None of the jurors were present at the time he made the remark.

The statement of facts on the contest over this question, is rather full and extended. The juror Mills denied using the expression that the defendant was a bad negro. He states it this way: "We were just arguing over the time. Along late in the evening we got to talking about the dead negro's character. I remarked, that may be Price Vanduran was a bad negro. I remember when Mr. Lee, or some man by that name, was running the county convict farm. I was carrying mail from old Sunny Side to Hempstead. I was there on the county convict farm, and I am not certain that Price Vanduran was there or not. As for my saying he was a bad negro, I did not know the negro when I saw him on the ·farm and used to go and weigh up cotton for them."

Judge Weir states: "That late in the afternoon we were discussing the length of time we were to give Price. I think we were for five years, and I think some for a longer term. I think six were in favor of a longer term, and one, may be two, holding out for two years. The others stood for a longer time, and agreed to come down a little in order to get a verdict. But later in the afternoon, this remark was made in the grand jury room, that he had guarded Price Vanduran. Q. Could you be positive that he stated that he had guarded him down there? A. He remarked that he had guarded him. Q. You told him that you thought Price a very good darky and you say that you remonstrated with him? A. Yes, sir; I thought that he was a very good darky, I had known him for some time. Q. Do you know anything about Mr. Mills saying that Price was a bad negro? A. Yes, sir; there was something said by some of the jurors, some one was making a good deal of capital out of the other negro about him being a bad negro, or something to that effect, that he was no angel, was not as good as he might have been. Q. When he was talking was that in a joking way? A. Yes, sir. Q. They were talking about the darky being a bad negro, and some said that Price wasn't no angel? A. That caused Mr. Mills to make the remark. I told him I did not think Price a bad negro as some other darkies, something like that. Q. Isn't it a fact that he said that Price Vanduran was a bad negro, and that he had been on the county convict farm, and that he had guarded him on the county convict farm? A. I don't remember the exact words, but it was words to that effect. Q. That he had guarded him on the county convict farm, he did

make that remark, and that he was a bad negro, and in reply to that you said you had never heard of anything against Price Vanduran? A. Something to that effect."

We believe under the facts of this case, that this was such misconduct on the part of the jury as would require a reversal of the judgment. A brief statement of the case may be necessary in order to show the conditions. Johnie James (deceased) by all of the testimony in regard to that question, was shown to be a reckless, desperate negro, served a term in the penitentiary, was a fugitive from justice for several felonies; a man who would execute a threat. All of this testimony was emphatic. Trouble had come up between deceased and appellant at the home of appellant, or rather in his corn crib, about thirty or forty feet from his residence, over a card game. There were quite a number of other negroes present. Defendant claimed some money that deceased thought was his, growing out of the bet. Deceased ran his hand in his pocket, and remarked that he would cut the throat of appellant, who immediately jerked his pistol and ordered him to desist. Deceased reached for a winchester lying near by, the property of one of the witnesses, who declined to let him have it. Everybody left the corn crib. Deceased breathed out threats to kill, started for a horse, in order to go for a gun—the witnesses saying that this was the first time they had ever known him to be unarmed, which fact was developed after his death. He used the vilest of epithets towards defendant, in connection with his threats, the vulgarity of which is sufficient to exclude them from this statement. After reaching his horse, he continued using the vile epithets and threatening to kill defendant, and not let him sleep in his own home again. Defendant ordered him away, and told him he could not talk that way in the presence of his family, which consisted of his wife and one or more daughters. Deceased continued using this language, and appellant went out near where he was and told him he must desist from using the language and leave his place and recant the language. Deceased was on the opposite side of his horse from appellant at this juncture, and immediately came around the head of the horse: some of the witnesses stating that with his right hand in his pocket, threatening to take the life of appellant. Some of them did not see his right hand in his pocket. As deceased reached the head of his horse, appellant fired one shot, which resulted fatally. The reputation of deceased was proved by other witnesses who testified in regard to the subject—State's and defendant's alike. The reputation of appellant was not put in issue. We think this rather extended statement of the facts on the main case, and on motion for new trial, is sufficient, and leads to the conclusion that appellant is entitled to a reversal. His reputation had not been placed in issue. He had testified in the case. So this testimony could be used for two purposes: (1) that he was a bad negro, that worked on a county convict farm, thereby placing his reputation in issue, which the State had no right to do, and

which that jury had no right to consider in the absence of testimony. (2). This testimony also, if admitted before the jury, bore directly upon his credibility as a witness; it could have been used as an attack on the credibility of his testimony. It was not introduced, and the jury had no right to consider it. That it was injurious to appellant we think is manifest from the condition of this record. One or two of the jurors were for the minimum punishment of two years.

The judgment is accordingly reversed and the cause remanded.

*Reversed and remanded.*