THE STATE v. JOHN R. MALONE, Appellant.—62 S. W. (2d) 909.

Division Two, August 12, 1933.

*M. G. Gresham, Bailey & Bailey, Harry C. Blanton* and *Frank K. Ashby* for appellant.

596

*Roy McKittrick*, Attorney-General, and *Geo. B. Strother*, Assistant Attorney-General, for respondent.

COOLEY, C.—Appellant was convicted of murder in the second degree and sentenced to ten years' imprisonment in the penitentiary for having shot and killed one Arthur Marshall at Sikeston, Scott County, Missouri, on the night of September 25, 1929. This is the second appeal. On the first trial, held in the Circuit Court of Scott County, appellant was convicted of murder in the second degree and sentenced to twenty years' imprisonment. On his appeal from that judgment we reversed and remanded the cause for errors in the trial. [State v. Malone, 327 Mo. 1217, 39 S. W. (2d) 786.] Thereafter the cause was sent on change of venue to the Circuit Court of Mississippi County in the same circuit where the second trial was held. The evidence was substantially the same as at the first trial except that on this trial the court permitted the introduction of evidence, excluded at the first trial, concerning a difficulty between Marshall, the deceased, and one Bean which occurred shortly before the homicide; and on this trial the defendant did not testify, whereas he did on the first. The State introduced as a statement of defendant the testimony which he had given, voluntarily, at the coroner's inquest held immediately following the homicide. The killing is not denied. It was witnessed by several men, all of whom testified. Defendant claimed self-defense. For the purpose of this appeal it is unnecessary to make a detailed statement of the facts, for which see

State v. Malone, supra. Such further reference to the facts as may be necessary will be made in connection with the discussion of the points to which they apply.

■ I. Honorable Frank Kelly, the regular judge, had been disqualified and had called another circuit judge, Honorable E. M. Dearing, to try the case. Judge Dearing presided at the first trial, but after the case was remanded he disqualified himself and declined to preside further, whereupon Judge Kelly called Honorable Will H. D. Green, judge of the Twentieth Judicial District, to try the case. Judge Green accepted the call and presided at the second trial. In his brief appellant challenges the authority of Judge Kelly to call another judge upon the refusal of Judge Dearing to preside further in the case but in oral argument here his counsel withdrew that complaint, so it need not be noticed further than to say that when Judge Dearing declined to act Judge Kelly, the regular judge, not Judge Dearing, had the right and it was his duty to provide another judge. [State v. Gillham, 174 Mo. 671, 74 S. W. 859; State v. Hudspeth, 159 Mo. 178, 60 S. W. 136.]

■ II. A half hour or so before Marshall and the defendant met in the restaurant in which the homicide occurred, Marshall, who was under the influence of intoxicating liquor and in an ugly mood, had assaulted and severely cut one Bean at a nearby roadhouse. Defendant who was present had ministered to Bean's wounds, which seemed to anger Marshall who thereupon began and thereafter continued to threaten and abuse defendant. Marshall and defendant had apparently been friendly prior to that occurrence. At the first trial the court had excluded all evidence relative to the trouble between Marshall and Bean at the roadhouse except that Marshall had threatened defendant because of his ministrations to and friendly attitude toward Bean. In our opinion on the first trial we said that defendant should have been permitted to prove enough of the circumstances of the difficulty between Marshall and Bean to show the nature and seriousness of that trouble and defendant's relation thereto, so that the jury might better judge whether it was of such nature as that defendant's proffered ministrations to Bean would likely have aroused deep-seated resentment toward him on the part of Marshall. On the second trial the court, following our mandate, permitted defendant to develop fully the circumstances, nature and seriousness of the assault by Marshall upon Bean, the defendant's ministrations to Bean and Marshall's malevolence toward defendant as a result thereof. The only evidence relative to that episode offered by defendant and excluded by the court was evidence as to the number of stitches the doctor who treated Bean had to use in closing his wounds and the doctor's subsequent treatment of Bean. This was offered for

the purpose of further showing the nature and extent of Bean's wounds. Appellant complains of the exclusion of that evidence. The court did not err in excluding it. The viciousness of the assault upon Bean and the nature and severity of the wounds inflicted were described by him and by others who witnessed that trouble sufficiently to enable the jury clearly to understand the nature and seriousness of that assault, defendant's conduct toward Bean and its effect on Marshall's feeling and subsequent attitude toward defendant; in short, to understand that occurrence fully in so far as it had relation to and bearing upon the homicide for which defendant was being tried. Beyond that it had no place in the case. The learned trial court correctly applied our former ruling on the point.

III. Complaint is made of the admission in evidence of the shirt worn by Marshall when he was shot. The State contended that one or more of the several bullets that struck Marshall struck him back of the median line of the left side, ranging forward about to the right nipple. Defendant's contention was that just before he fired, Marshall, who had been seated on a revolving stool at the lunch counter when defendant entered the restaurant, turned toward him, turning from right to left, and rose or started to rise from the stool, at the same time reaching for his knife which, as defendant had reason to believe, he had in his right trousers pocket with the blade open. On the first trial defendant had testified that before he fired Marshall had at least partially drawn the knife from his pocket so that defendant could see the blade, which would indicate that Marshall was at least partially facing defendant at the moment defendant fired. The exact location of the bullet wounds had a bearing on the question of self-defense. While their location was described by witnesses who had viewed the body the descriptions of different witnesses were not precisely alike. The shirt was offered for the purpose of better enabling the jury to visualize and determine the location of the wounds. It had been washed and had no blood upon it when introduced. In State v. Stogsdill, 324 Mo. 105, 23 S. W. (2d) 22, we said that demonstrative evidence of this character is admissible if it tends to throw light upon a material matter at issue and that, within limits stated, its admission must be left largely to the discretion of the trial judge, "and only when it appears that this discretion has been abused will we interfere therewith." [324 Mo. l. c. 129, 23 S. W. (2d) 22.] We see no abuse of discretion in the admission of the clothing in this case.

IV. Error is assigned in the court's refusal to give an instruction, F, requested by defendant, telling the jury specifically that "the burden of proof rests upon the State to prove beyond a reasonable doubt that the killing was without justification or excuse

and was not in self-defense." Appellant insists that in refusing that instruction the court failed to follow our opinion on the first appeal. In that opinion we condemned an instruction stating in substance that the burden of proving to the reasonable satisfaction of the jury that he killed the deceased in self-defense rested upon the defendant. We also reviewed several other instructions, some of which we disapproved. In concluding the opinion we directed that on a retrial the instructions should be made to harmonize with the views therein expressed. Appellant now contends that in refusing his requested Instruction F the court failed to observe that direction. We do not agree with him. We did not direct that the trial court should in its instructions single out and instruct specifically and separately that the burden rested upon the State to prove lack of justification or any other particular element of the offense charged. The trial court was not required to do so. In the instruction given, submitting murder in the second degree, the court specifically required the jury to find, in order to convict, that the killing was done by defendant "not in self-defense as such defense is explained in other instructions given you in this case." The instructions on murder in the first degree and manslaughter contained a similar requirement. By other instructions the law relative to self-defense, as applicable to the case, was fully stated. The usual instructions on reasonable doubt and presumption of innocence were given. The refusal of said Instruction F was not error.

V. Error is charged in the instruction given on manslaughter "in that it defined it (manslaughter) to be the intentional killing, etc., *without malice and without premeditation,* but says nothing about the absence of 'deliberation;' thereby inferentially telling the jury that unless the defendant had deliberated, he couldn't be guilty of manslaughter, whereas, the law is not only must there be an absence of *malice and premeditation,* but there must likewise be no *deliberation.*" The alleged ground of objection is fanciful rather than real. There could not be deliberation without premeditation, the latter term being usually defined as meaning "thought of beforehand for any length of time, however short." Absence of malice and premeditation necessarily connotes absence of deliberation. No intelligent juror could fail so to understand. In State v. Sabastian, 215 Mo. 58, 114 S. W. 522, manslaughter under the then statute was defined (not in an instruction) as "the intentional killing of a human being in a heat of passion on a reasonable provocation, without malice and without premeditation, and under circumstances which will not render the killing justifiable or excusable homicide." In State v. Gore, 292 Mo. 173, 237 S. W. 993, it is said that under the present statute the elements "heat of passion" and "reasonable provocation" need not be included in an instruction defining man-

slaughter. The instruction in the Gore case did use those phrases but without defining them, which this court held was not error because they need not have been used. Pertinent to the case in hand the instruction in the Gore case further defined manslaughter as a killing "without malice and without premeditation," saying nothing about deliberation. It was held good. Under the decision in the Gore case the instruction in the instant case measures up to the requirements of the law under the present statute.

There are some other criticisms of certain given instructions and of the court's refusal to give others requested by defendant, which we deem it unnecessary to discuss. We have examined the instructions and are satisfied that, taken together, those given sufficiently and fairly submitted every issue in the case. The learned trial court obviously and properly framed them, having in mind the suggestions made by this court on the former appeal. Complaints of certain rulings in the admission of evidence are likewise, in our opinion, without substantial merit and do not require discussion.

VI. The most serious question presented by this appeal is the alleged misconduct of the jury after submission of the case, and in this connection the alleged separation of the jury and certain alleged misconduct of the officers in charge of the jury. Preliminary to consideration of this question we dispose of another contention, in substance that the panel from which the trial jury was to be selected was not fairly and properly drawn and was not drawn from the whole county but only from one section thereof nearest Scott County where the homicide and former trial had been more or less discussed.

▉ (a) This latter question was not raised or adverted to in defendant's motion for a new trial, which was filed on December 19, 1931. The verdict was returned on December 10, 1931. The court granted defendant ten days within which to file motion for new trial and his original motion was filed within that time, as above shown. On January 27, 1932, at the same term, but a month and a half after the rendition of the verdict, the defendant filed what he designated as an amendment to his original motion, but expressly stating therein that it was intended as an addition to and not a substitution for the original motion. It was in this amendment, which for convenience we shall call the supplemental motion, that defendant for the first time raised and sought to preserve his objections to the manner in which the jury panel had been drawn. The bill of exceptions recites that the supplemental motion was filed by leave of court, though at the hearing thereon the court expressed grave doubt as to whether it could be considered on account of its untimely filing. That it cannot be considered and preserves nothing for review, we think clear. Prior to 1925 the statute required motions for new trial in

criminal cases to be filed before judgment and within four days after verdict if the term so long continued, if not then during the term. That statute had been uniformly held by this court to be mandatory. See State v. Hascall, 284 Mo. 607, 266 S. W. 18, holding that a supplemental motion for a new trial filed more than four days after verdict preserved nothing for review. In 1925 the statute, now appearing as Section 3735, Revised Statutes 1929 (4 Mo. Stat. Ann. p. 3275), was amended by adding a proviso "that the court shall have power . . . to extend the time for filing such motion for a period not exceeding ten days from the date of the return of the verdict." The statute gives the court no authority to grant a longer time than ten days. No reason is suggested and none occurs to us why the ten day provision should not be construed to mean what it says and to be as mandatory as the four day provision in the former statute was always held to be. If the court could permit the filing of such motion more than ten days after verdict and give it consideration it would nullify that provision of the statute. In State v. Harrison (Mo.), 29 S. W. (2d) 63, we held that a motion for a new trial not filed within the time as extended by the court under the statute was a nullity. That a motion for a new trial cannot be amended after the statutory time for filing it has expired, see State v. Dusenberry, 112 Mo. 277, 20 S. W. 461; State v. Midkiff (Mo.), 286 S. W. 20, 24. The matters attempted to be presented by said supplemental motion cannot be considered.

 (b) The contentions as to misconduct of the jury and of the officers in charge thereof and the separation of jurors were preserved in the original motion for a new trial. The court heard evidence in support of those allegations of the motion which developed the following facts.

The case was submitted and the jury retired to deliberate immediately after the noon meal. Two deputy sheriffs were duly sworn under the statute and placed in charge of the jury. The judge who had presided at the trial felt compelled to leave in order to be in a county in his own circuit next day and by agreement of the State and defendant he departed leaving a member of the bar, Judge Boone, to receive the verdict. No point is made because of Judge Green's departure. When supper time arrived the jurors had not reached an agreement and they were taken to supper at a hotel. The wash room at the hotel, which opened off the "parlor," was not large enough to accommodate all of the jurors at one time and while part of them were in the wash room the others remained in the parlor, a deputy sheriff being at all times with each group. Also, while at the hotel four or five of the jurors, in charge of one of the deputies, at one time passed from the parlor into the adjoining lobby where there was a telephone, the other jurors remaining in the parlor in charge of the other deputy and the door between parlor and lobby

being open. The defendant's evidence tended to show that several of the jurors used the telephone talking to some persons outside. After returning to the jury room and at different times between that time and the time, about 10:30 P. M., when the verdict was returned, several jurors were seen at different times on a porch or balcony adjacent to the jury room. This porch was twelve or fifteen feet above the ground and could be reached only from the jury room through windows of that room which were open, the night being warm. There was no evidence of any communication or attempted communication between any member of the jury and persons other than fellow jurors either at the hotel or while jurors were on said porch, except the telephone conversations mentioned.

On two or three occasions while the jury was deliberating one of the deputies in charge of the jury went into the jury room, closing the door and remaining one or two minutes. Defendant's evidence does not show what transpired while the deputy was so in the jury room. On these points the State's evidence tended to show that the deputy sheriff entered the jury room to wait upon the jury and that while he was in the room nothing was said about the case, he having no communication with the jurors except to attend to their wants; that the jurors who stepped out on the porch did so to answer a call of nature and did not see or communicate with any one; that at the hotel a deputy sheriff was at all times with each group of jurors when they were separated as above stated, and that they did not communicate with other persons except by said telephoning. The deputy who accompanied the jurors who went into the lobby of the hotel testified that he did the telephoning for all of those jurors but one, it consisting merely of calling up their homes at their request and telling their families that said jurors would not be able to come home that night. He said he permitted one juror to call his wife and that all the juror said over the telephone was that he was hung up on the jury and probably could not get home that night. A joint affidavit signed by all the jurors and filed by the State says that four jurors "talked over the telephone relative to matters in nowise concerning the case, and in such instances such telephone conversation was carried on in the presence and hearing of an officer in charge of said jury."

We have mentioned the open windows of the jury room. Adjacent to that room was the back room of the office of one of defendant's attorneys, the window of which was also open and only a few feet from the open window of the jury room. In that office, after the jury returned from supper, were one of defendant's attorneys, defendant's brother, brother-in-law and several others. By the testimony of several of these it was shown that while the jurors were considering the case after supper one of them told his fellows that on the former trial defendant had been convicted and given twenty

years; that one of them said defendant had been in trouble several times before "and if we don't punish him this time he will be in trouble again." The attorney who gave that testimony thought from the voice that it was a juror named Burns who made those statements. Burns was in the courtroom at the hearing but was not called to refute the testimony. That testimony was corroborated by other witnesses who had been in the lawyer's office at the time. One of them, defendant's brother, testified that when the remark was made in the jury room about defendant having been in trouble before one juror said: "I wouldn't turn a fellow like that loose at all." There was no denial of that testimony. He also testified that something was said in the jury room to the effect that defendant had once made his wife jump out of a rapidly moving automobile, which likewise was not refuted. There was evidence that when the reference was made to defendant's former trial and his former troubles one juror said: "We are not to consider those things."

The above-mentioned affidavit of the jurors states, relative to the alleged occurrences in the jury room: "That prior to the time we were summoned as jurors in this case, some of the jurors had personal knowledge of the reputations and former convictions of the defendant, and that defendant had been convicted and assessed twenty years' imprisonment in the State penitentiary on his former trial on this charge, but no juror was asked on *voir dire* examination if he knew of such facts if he had been asked he would have gladly disclosed such facts. While such reputation and former convictions may have been mentioned by some jurors in the jury room, some of the jurors evidently did not hear it, as they have no recollection thereof. And such facts were not used nor attempted to be used at any time by any juror to influence the verdict of any other juror.

"We and each of us say that in sitting as jurors and in deciding this case, we followed our oaths as jurors, and heard and decided this case strictly according to the law and the evidence produced before us in open court, uninfluenced by any malice, ill will, fear, favor or affection, or any partiality whatever."

We are inclined to think that the alleged separation of the jury and the fact that the deputy sheriff entered the jury room two or three times, as stated, would not justify reversal. The officer should not thus have gone into the room and closed the door. But he remained only a minute or two each time and held no communication with the jurors relative to the case, nor does it appear that any of them mentioned the case while he was present. [See State v. Spaugh, 200 Mo. 571, 610, 98 S. W. 55.]

A quite different situation was presented in State v. Hayes, 323 Mo. 578, 19 S. W. (2d) 883, wherein we held that the conduct of the officer in charge of the jury was a violation of the statute. For discussion of the question of the separation of the jury see State v.

Hayes, supra; State v. Shipley, 171 Mo. 544, 71 S. W. 1039; State v. Spaugh, supra; State v. Gregory, 158 Mo. 139, 59 S. W. 89.

Members of the jury should not have been permitted to use the telephone as was done in at least one instance. If it was necessary to send messages to their families the messages could all have been transmitted by the officer in charge, as some of them were, and it would have been better if even that had been done with permission of the court. While in this case the evidence introduced and the affidavit of the jurors show that the officer in charge of the jury heard all that was said by the jurors telephoning, no one but the person using the telephone could hear what was said to him by the one at the other end of the line. Such telephone conversations afford opportunity for communications to be made to a juror unknown to the court or the officer in charge. We do not mean to imply that improper communications were so made in this case. But thus permitting the possibility of improper influences reaching a juror is contrary to the spirit and purpose of the statute and should be avoided. In Early v. State, 51 Tex. Cr. App. 382, 103 S. W. 868, similar telephone conversations by jurors with members of their families were held to require reversal of the judgment of conviction, it not being sufficiently shown, in the opinion of the court, that prejudice to the defendant could not have resulted. We need not determine whether the telephone conversations shown in this case would necessitate reversal of the judgment because in our opinion the judgment must be reversed because of the occurrences in the jury room.

This question is one that does not often arise, particularly in this State where the rule is rigidly enforced that jurors cannot be heard to impeach their own verdict. In Texas and to a certain extent in Washington, Kansas and Iowa, it seems that misconduct of jurors such as that here in question, may be shown by members of the jury. The courts of those states, as shown by cases hereinafter cited, have held that the communication by a juror to his fellow jurors of facts not in evidence and damaging to the defendant calls for reversal if he is convicted. In our own jurisdiction the statute, Section 3733, Revised Statutes 1929 (4 Mo. Stat. Ann. p. 3272), provides that when a new trial has been awarded the former verdict shall not be used or referred to on the subsequent trial, either in the evidence or argument, and Section 3734. Revised Statutes 1929. provides that a new trial may be granted if, among other grounds, the jury has received any evidence not authorized by the court or, after retiring to deliberate, has been guilty of misconduct tending to prevent a fair and due consideration of the case. Fair and due consideration of the case must mean consideration based on the evidence. In the instant case the facts disclosed by certain jurors to their fellow jurors in the jury room were not in evidence and had not been referred to in the trial. The defendant had not taken

the witness stand and any reference in evidence to the former verdict, to his alleged mistreatment of his wife or to his having been "in trouble" before would have been incompetent. Had evidence of such matters been offered and admitted over his objections it would have been reversible error. If the admission of such evidence in the trial where he at least might have had opportunity to meet and perchance explain the damaging facts, would be prejudicial, it cannot be less so when the facts are brought to the attention of the jurors in the jury room by one of their fellows whose word, of course, the others have no reason to doubt and without the knowledge or consent of defendant nor with any opportunity for him to explain the facts or rebut the unfavorable inferences. The affidavit of the jurors virtually admits that the alleged damaging facts were referred to. They state collectively that some of their number evidently did not hear the statements "as they have no recollection thereof," and further that such facts were not used or attempted to be used "by any juror to influence the verdict of any other juror," and in substance that they decided the case conscientiously and in accordance with the law and the evidence, "uninfluenced by any malice, ill will, fear, favor or affection, or any partiality whatever." Those statements are largely conclusions. Conceding entire sincerity to the jurors, how can any one of them know what effect the facts disclosed in the jury room had upon the minds of his fellow jurors? Indeed, can he *know* that the knowledge of those facts did not, perhaps unconsciously to himself, to some extent influence his own judgment? It would be to establish a dangerous precedent for the court to hold that the communication to jurors of facts calculated to prejudice a defendant's case and without opportunity given him to explain or rebut them, may be considered non-prejudicial because the jurors, in support of their verdict, partly, mayhap, in extenuation of their own conduct, say they were not influenced by such facts. In order that confidence in the jury system may be maintained its functioning must be kept free from suspicion or the room for suspicion of improper influence.

In State v. Sanders. 68 Mo. 202, several members of the jury, after the case had been submitted, without leave of court and in the absence of the defendant made certain experiments to determine whether worn boots such as described in the evidence, would make tracks such as had been described. This court reversed the judgment of conviction, notwithstanding the fact that defendant's counsel had, in his argument, invited the jury so to experiment. The court said that the trial court should have corrected counsel's misstatement and should not have allowed the jury to be misled as to their duties or powers. It was further said that the experiment amounted to the introduction of evidence on a material point in the absence of the defendant and the court, and in concluding its discussion stated

that "without especial regard to the present case, we are of opinion that it would be unsafe to further relax the well established rules governing the conduct of juries, and that we must, therefore, remand this case for another trial."

In McDougal v. State, 81 Tex. Cr. App. 179, 194 S. W. 944, L. R. A. 1917E, 930, the disclosure by a juror to his fellow jurors of the result of a former trial and the discussion of the former verdict was held to require reversal of the judgment. The question is discussed at length and many former decisions of the same court are reviewed.

Disclosure by a juror to his fellow jurors of facts damaging to the defendant which had not been introduced in evidence were held to require reversal in Helvenston v. State, 53 Tex. Crim. App. 636, 111 S. W. 959; Maples v. State, 60 Tex. Crim. App. 169, 131 S. W. 567; Vanduran v. State, 50 Tex. Crim. App. 440, 98 S. W. 247; Cotton v. State, 88 Tex. Crim. App. 618, 228 S. W. 943; Pierce v. State, 87 Tex. Crim. App. 379, 222 S. W. 565. And see note to Smith v. State (Tex. Crim. App.), 15 Ann. Cas. 357, 361, et seq.

In State v. Burton, 65 Kan. 704, 70 Pac. 640, 14 Am. Cr. Rep. 688, a juror stated in the jury room that a former jury had found the defendant guilty of murder in the first degree. Other statements of facts not in evidence, damaging to the defendant, were made in the jury room. The facts on that point are somewhat similar to those of the instant case. The court held that such misconduct of the jury required reversal of the case. In its discussion of the question the court said (65 Kan. 1. c. 708):

"It is true THE JURORS TESTIFIED THAT THEY WERE NOT AFFECTED by the statements and extraneous influences, but that kind of testimony is hardly sufficient in a case involving the liberty of a prisoner for life. Jurors will generally hold the opinion, and honestly too, that they were not prejudiced by improper influences; but who can say that these statements, based on the personal knowledge of their associates, did not unconsciously influence their judgment and action? Who can say that they were not affected by the information wrongfully introduced in the jury room that another jury had at another time found the defendant guilty of the highest degree of the crime with which he was charged? Nor is it easy to show that the defendant suffered no prejudice from the testimony from the outside that the public of Marion County believed he was guilty of murder in the first degree.

"It is the aim of the law to surround a trial by such safeguards as will exclude all external and improper influences from the jury, and thus protect the rights of the defendant and prevent the conviction of the innocent. It has been said by this court:

" 'We cannot be too strict in guarding trials by jury from improper influences, and in compelling a rigid and vigilant observance

of all the provisions of the statutes tending to preserve the purity of such trials. The verdict, when returned into court, must command entire confidence. It must be secure from all improper bias, and even from the suspicion of improper bias.' [The State v. Snyder, 20 Kan. 306, 310.]''

The statement of material facts not in evidence and calculated to be prejudicial to the defendant, made by a juror to his fellow jurors, was held to be reversible in the following cases: State v. Duncan (Kan.), 78 Pac. 427; State v. Beam (Kan.), 42 Pac. 394; State v. Lowe, 67 Kan. 183, 72 Pac. 524, 14 Am. Cr. Rep. 693; State v. Parker, 25 Wash. 405, 65 Pac. 776; State v. Lorenzy, 59 Wash. 308, 109 Pac. 1064; Ryan v. State (Tenn.), 36 S. W. 930; Douglass v. Agne (Iowa), 99 N. W. 550. In Iowa, however, it seems to be the rule that to justify reversal it must appear that prejudice probably resulted. [See State v. Olds (Iowa), 76 N. W. 644; State v. Wright (Iowa), 68 N. W. 440.] In Ryan v. State, supra, the Tennessee Court said that: ". . . To vitiate the verdict . . . the proof is not upon the prisoner to show affirmatively that he was prejudiced by the improper evidence received by the jury. It is enough that he may have been prejudiced, and the law will so presume.'' [Citing cases.] The latter rule is in harmony with the principle of our own decisions. We have consistently held that a separation of the jury in violation of the statute is ground for reversal unless it is affirmatively shown that the jurors were subjected to no improper influence and that no prejudice to the defendant resulted. [State v. Orrick, 106 Mo. 111, 17 S. W. 176; State v. Jeffries, 210 Mo. 302, 109 S. W. 614; State v. Schaeffer, 172 Mo. 335, 72 S. W. 518; State v. Asbury, 327 Mo. 180, 36 S. W. (2d) 919; State v. Hayes, supra.] The same principle should apply to misconduct of the jury such as was here shown. In the case before us there was no sufficient showing that the improper reference in the jury room to the former verdict and to facts not in evidence and in their nature damaging to defendant's cause did not in fact operate or may not have operated to defendant's prejudice.

The thought has occurred to us that since one of defendant's attorneys had knowledge before the return of the verdict of the alleged misconduct of the jury, the matter should have been reported to the court and redress sought before the verdict was returned. But the judge who presided at the trial was not available, having gone to his or another county in his own circuit. Judge Boone, who, by agreement of the parties, had been delegated to receive the verdict, had no authority to act in the capacity of judge or court. Under the circumstances we think we cannot justly hold that appellant waived the right to ask review of these matters. He brought them to the attention of the trial court in his motion for new trial.

The judgment of the circuit court must be and it is reversed and the cause is remanded. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.