**STATE of Missouri, Plaintiff-Respondent,**

v.

**Daniel E. KIMBALL, Defendant-Appellant.**

**No. 11546.**

Missouri Court of Appeals, Southern District, Division Two.

March 10, 1981.

Motion for Rehearing or Transfer Denied March 26, 1981.

Application to Transfer Denied May 11, 1981.

Loren R. Honecker, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Paul M. Spinden, John M. Morris, III, Asst. Attys. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

A jury found Daniel E. Kimball guilty of first-degree robbery as defined and denounced by § 560.120, RSMo 1969, now repealed. The trial court determined that the Second Offender Act, § 556.280, RSMo 1969, also now repealed, was applicable and assessed defendant Kimball's punishment at imprisonment for a term of 50 years. Defendant appeals.

■ The sufficiency of the evidence to support the judgment of conviction has not been questioned. Nevertheless, this is defendant's appeal of constitutional right, *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437,

41 L.Ed.2d 341 (1974), and defendant had a due-process right to have the State present evidence from which any rational trier of fact could find the essential elements of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). The sufficiency of the evidence to support a conviction of first-degree robbery will therefore be considered. Nothing said in *Jackson* alters the rule that the State is entitled to that construction of the evidence most favorable to the result reached. *State v. Letterman*, 603 S.W.2d 951, 952–953[3] (Mo.App.1980).[1]

On October 31, 1978—Halloween—Michael Dodd was working at the MFA Oil Company, a service station in the south part of Springfield, Missouri. Dodd was alone. About 7 p. m. a man, unequivocally identified by Dodd as the defendant, entered the station. Although it was not particularly cool, Dodd noticed the defendant was wearing a "creamish-looking" trench coat. The defendant walked over to the cash register; Dodd asked "if [he] could help" the defendant. Kimball answered "Yes, you can," and "flipped his coat open," exposing a sawed-off shotgun "pointed straight at" Dodd. Kimball then ordered Dodd to open the cash register. Dodd obeyed. Defendant then took the contents of the register, about $156. Dodd testified that the money taken belonged to his employer and was in his possession as an employee. The defendant then ordered Dodd to "go outside" the station. The two men walked some distance away from the station; Kimball then told Dodd to "turn back toward [the station] and run like hell." Dodd ran back to

---

1. The language of *Jackson, supra*, 443 U.S. at 318–319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 is : "After Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.... [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.... This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts...." (emphasis in original text) *Jackson* merely restates our criterion of sufficiency as a due-process standard. See, e. g., *State v. Lee*, 556 S.W.2d 25, 32[13] (Mo. banc 1977); *State v. Cobb*, 444 S.W.2d 408, 412[3] (Mo. banc 1969); *State v. Sykes*, 372 S.W.2d 24, 26[3] (Mo.1963).

the station and "called the law." During the course of his examination, Dodd also testified concerning his state of mind during the incident, as follows:

"* * *

Q. At the time ... the money was taken from the cash register, was this with or against your will?

A. Well, the shotgun was on me, I'd call it against my will.

Q. And at the time the money was taken from the cash register, state whether or not it was because you feared some immediate injury to your person.

A. I mean, I wasn't going to fight ... with him with that shotgun in his hand, no way.

Q. Well, you're telling us you were in fear then?

A. Yeah—Yeah.

* * * "

The State also had evidence from one Jimmie Hamilton, defendant's brother-in-law, who testified as an immunity witness. Jimmie's sister Gladys (defendant's wife) had introduced Jimmie to the defendant "a couple of weeks" before the robbery was committed. Kimball indicated "he was wanting a shotgun." Jimmie "borrowed" a shotgun from a friend and "took it home and sawed it off," stock and barrel. The shotgun was then disassembled and the parts were concealed in a "console" in Kimball's car.

Early in the evening on October 31, 1978, Jimmie, Gladys and the defendant left Jimmie's residence and drove to a "truck stop" in north Springfield. At the truck stop the three "drunk some coffee." There "was talk" about "going to the service station" and Kimball observed "It was [Gladys'] birthday and he was going to get her something for her birthday."

Jimmie, Gladys and the defendant then left the truck stop in the defendant's car. Kimball was driving; Gladys was seated next to him and Jimmie was "in the back." The defendant drove to a place near the MFA Oil Company and parked his car. According to Jimmie, Kimball was wearing a trench coat. Jimmie also remembered that Kimball took the shotgun from the "console" before he got out of the car. Defendant then left, was gone for a short time and returned "running." The defendant told Jimmie and Gladys "We have to get out of here." Kimball, Gladys and Jimmie then went directly to a residence in north Springfield.

Section 560.120, RSMo 1969, proscribed one offense which might be committed by several different methods. *State v. Montgomery*, 109 Mo. 645, 647, 19 S.W. 221, 222 (1892). For the purposes of this case, the elements of the offense with which the defendant was charged may be identified by setting out the pertinent sections of the statute. In material part, § 560.120 read:

"Every person who shall be convicted of feloniously taking the property of another ... in his presence, and against his will ... by putting him in fear of some immediate injury to his person ... shall be adjudged guilty of robbery in the first degree."

In the case at hand, it may be said that the State was obliged to prove that Kimball: (1) Feloniously took (2) the property of another (3) in his presence (4) against his will (5) by putting him in fear of some immediate injury to his person. In addition the State was obliged to prove the defendant's criminal agency. See *State v. Meidle*, 202 S.W.2d 79, 81 (Mo.1947); *State v. Gillman*, 329 Mo. 306, 312, 44 S.W.2d 146, 148[5] (1931).

The testimony we have summarized was of itself sufficient to support the judgment of conviction. The word "feloniously," as used in § 560.120, merely classified the offense; it did not denominate a distinct element of the crime denounced. *State v. Harris*, 313 S.W.2d 664, 669[4] (Mo. 1958). The required "taking" was provided by Dodd's testimony. At gunpoint, Dodd opened the cash register. Kimball removed the money from the register and reduced it to possession. There was a "taking" within the intent of § 560.120. *State v. Murray*,

280 S.W.2d 809, 812[6] (Mo.1955); *State v. Thomas*, 525 S.W.2d 833, 834–835[1–3] (Mo. App.1975). Dodd further testified that the money taken was in his possession as an employee of the MFA Oil Company. Kimball therefore took the "property of another"; a taking from an employee in possession is a taking from the employer. *State v. Montgomery*, 181 Mo. 19, 26–27, 79 S.W. 693, 695 (1904).

▮ Was the money taken "in [Dodd's] presence?" Dodd stated that he "backed away" from the cash register when he saw the shotgun; he was about "[t]hree or four foot" from the defendant when the money was taken. This evidence was sufficient to prove the money was taken "in [Dodd's] presence." *State v. Eddy*, 199 S.W. 186, 188 (Mo.1917); W. LaFave and A. Scott, Criminal Law 696 (1972). Dodd's testimony that the robbery was committed "against his will" has been set out and need not be repeated. The State's proof directed to the final element—fear of immediate injury—is amply sufficient. Dodd stated directly and unequivocally that he was put in fear, but such testimony was not absolutely necessary. The evidence of compliance and submission at gunpoint permitted the jury to infer that the victim was put in fear of immediate injury to his person. *State v. Reeder*, 394 S.W.2d 355, 359 (Mo.1965); *State v. Ray*, 354 S.W.2d 840, 843 (Mo.1962). As noted, a judgment of conviction must be supported by evidence of the defendant's criminal agency. This is not a case, however, in which the defendant's criminal agency is a substantial issue. At the trial, Dodd identified Kimball as the man who committed the robbery. The in-court identification was neither irresolute nor uncertain. When Dodd's testimony is considered with that of Jimmie Hamilton, it is apparent defendant's criminal agency was established beyond a reasonable doubt. The State fully complied with the mandate of

*Jackson v. Virginia, supra*, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573.

The first point briefed and argued is that the trial court erred in receiving State's exhibits 1, 2 and 4 in evidence because those exhibits were the product of an unreasonable search and seizure conducted in violation of defendant's Fourth and Fourteenth Amendment rights. State's exhibit 1 is a sawed-off shotgun.[2] State's exhibit 2 is a shell taken from the shotgun and State's exhibit 4 is defendant's wallet. These exhibits were taken from the automobile defendant was driving when he was arrested.

Fairly paraphrased, defendant's contention is that: 1) State's exhibits 1, 2 and 4 were incident to and the product of an unlawful arrest because the defendant was arrested without probable cause; 2) If the arrest was lawful, the search incident thereto was impermissibly broad; 3) State's exhibits 1, 2 and 4 were the products of an unreasonable search and seizure because the officers who searched the automobile had neither a warrant nor grounds to conduct a warrantless search. Fair consideration of this point and the other point briefed requires a statement of some evidentiary detail.

▮ Some general principles concerning "probable cause" to arrest must be borne in mind. Probable cause to arrest exists when the facts and circumstances within the officers' knowledge and of which they have reliable and trustworthy information would warrant a man of reasonable caution to believe that the person being arrested had committed the crime for which he has been taken in custody. *Ker v. California*, 374 U.S. 23, 34–35, 83 S.Ct. 1623, 1630–1631, 10 L.Ed.2d 726, 739 (1963) (separate opinion); *State v. Moore*, 580 S.W.2d 747, 749 (Mo. banc 1979); Cf. *State v. Wiley*, 522 S.W.2d 281, 287[1–3] (Mo. banc 1975). The existence of probable cause

2. Some idea of the order of weapon used by the defendant and the virulence of his intent may be drawn from the measurements of State's exhibit 1. Exhibit 1 was originally a Harrington and Richardson "Topper" model 158, a single-shot 20-gauge shotgun. As "modified" by defendant or Jimmie Hamilton, the weapon measures 13 inches from muzzle to the base of the firing pin and 18 inches from muzzle to the butt of the stock. The diameter of the muzzle is 5/8 inch.

must be considered in light of the information available to the officers at the time the arrest was made. *State v. Hicks*, 515 S.W.2d 518, 521[1] (Mo.1974); *State v. Kelley*, 473 S.W.2d 707, 710[3] (Mo.1971); *State v. Abbott*, 571 S.W.2d 809, 811 (Mo.App. 1978). Nevertheless, in assessing the existence of probable cause, we look to the collective knowledge of the officers, including fair inferences. *United States v. Belle*, 593 F.2d 487, 497 n. 15 (3rd Cir. 1979), cert. denied, 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 277 (1979); *State v. Wiley, supra*, 522 S.W.2d at 287[5]; *State v. Kelley, supra*, 473 S.W.2d at 709. Further, the existence of probable cause is a matter of actual fact, and the officers' subjective opinions or characterizations of their actions are not material. *Klingler v. United States*, 409 F.2d 299, 304–306[9][10][11] (8th Cir. 1969), cert. denied 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969); *McNeely v. United States*, 353 F.2d 913, 918[11] (8th Cir. 1965); *State v. Abbott, supra*, 571 S.W.2d at 815.

These general principles considered, the record justifies the following statement: In November and December 1978, the Springfield Police Department was investigating a series of armed robberies in which the perpetrator had used a sawed-off shotgun to intimidate and subdue his victims. Several officers were investigating these crimes. The incidents had received attention from the news media; the perpetrator had been referred to as the "shotgun bandit."

On December 4, one Gloria Dye was interrogated as a suspect in a burglary investigation. Gloria denied complicity but willingly became an informer. Gloria's information, based on observation and statements she had heard, was that the "shotgun bandit" was a man known to her as Al. Al was consorting with one Gladys Hamilton. Al and Gladys, when in Springfield, stayed at 1323 East Atlantic Street with some other members of the Hamilton family.

Other items of information imparted by Gloria were: 1) That Al and Gladys were escaped convicts, having escaped penal custody in the State of Washington; 2) That they had, after their escape, stolen a vehicle at Tacoma; this automobile had been left at a trailer park north of Springfield; 3) That Gladys and Al used a yellow Plymouth as transportation when committing a robbery, but did not otherwise operate the vehicle when they were in Springfield; 4) That Al and Gladys were out of the city at present, but were expected to return on Friday, December 8; 5) That Al had "bragged" that he had committed several of the crimes under investigation; 6) That Al's modus operandi included the use of a sawed-off shotgun to intimidate his victims; 7) That following a robbery, the sawed-off shotgun was disassembled into three parts and was concealed in Gladys' purse; 8) That following each robbery Gladys and Al would return to the Atlantic street address, put the yellow Plymouth in the garage and monitor police calls on a radio scanner taken in one of the robberies, and 9) That "[Al] had made the statement that he would not be taken alive, but would shoot it out with the police." Gloria furnished a general description of the man she knew as "Al."

The investigating officers immediately undertook to corroborate the information supplied by the informer. Telephone contact with Washington State authorities revealed that Gladys had escaped from penal custody in Washington and another escaped convict, Daniel Kimball, was believed to be with her. The officers were further advised that Kimball was wanted as an escapee from the Washington State Penitentiary at Walla Walla; they were given the number of the superior court warrant authorizing his arrest. The officers at Walla Walla also furnished a description of Kimball which comported generally with that furnished by the informer.

Two officers went to the local trailer park where Gloria said the stolen vehicle could be found. They learned the vehicle had been moved. The officers were taken to a nearby garage where the vehicle had been stored. They found a black and brown Pontiac. The vehicle identification number was noted. The officers contacted the National Criminal Information Center

by computer terminal; they determined the vehicle had been stolen. Further telephone contact with Washington State revealed that the Pontiac had been stolen at Tacoma on October 22, 1978, by a female work-release prisoner identified as Gladys. The date of this theft preceded the first of the "shotgun bandit's" activities by about 2 weeks.

Local inquiry disclosed that Gladys Hamilton's mother and several of her children lived at 1323 East Atlantic Street in Springfield. The garage where the stolen vehicle was found was annexed to a residence occupied by one of Gladys' brothers.

Surveillance of the Atlantic Street address was commenced on Thursday, December 7. Nothing of significance was observed. On Friday evening, December 8, "There was a lot of people coming [in] and going out of the house and two of the officers saw a yellow Plymouth automobile parked in the garage [at the Atlantic Street address]."

On Saturday, December 9, two plainclothes officers in a police vehicle "set up" east of the Atlantic Street address, two more stationed themselves a short distance west of the house and two uniformed officers were ordered to patrol the area by "circling" the block. About 7 p. m., the yellow Plymouth was "backed out" of the garage and parked "in front" of the house on Atlantic Street "with the headlights on and several people around the car." There were three people in the Plymouth. The driver, according to one of the officers, "matched" the general description of the "shotgun bandit."

The uniformed officers were ordered to intercept the Plymouth. The Plymouth was driven to a nearby convenience store, however, and the officers were ordered to "drive on by" because the plainclothes officers thought an attempted apprehension might be resisted with gunfire and there were a number of bystanders near the convenience store. The Plymouth was then driven directly back to the Atlantic Street address. At this point, another officer was able to get a "close look" at the driver.

The driver "matched" the description of the "shotgun bandit" received from his victims.

The Plymouth was stopped briefly at the Atlantic Street house. As soon as it began moving again, the uniformed officers were ordered to intercept the vehicle. They stopped the Plymouth on a public street. One of the two uniformed officers got out of his car, walked up to the Plymouth, and asked the driver for identification; the driver's response was that he had "left his wallet at home." The plainclothes officers arrived, and the occupants were either asked or ordered to step out of the Plymouth. The defendant was ordered to stand near the rear fender on the "driver's side"; Gladys was nowhere near the Plymouth; she and her brother Jimmie—the third occupant of the Plymouth—were standing near the curb of the street. Officer Tom Gann, one of the uniformed officers, thereupon searched the Plymouth. After the defendant got out of the Plymouth, and with the door left open, Officer Gann "could see a wallet lying on the floorboard under the driver's seat." This officer thereupon "picked it up and checked identification." The wallet (Exhibit 4) contained defendant's driver's license. Officer Gann then searched the car further and found a sawed-off shotgun (Exhibit 1). It was loaded with Exhibit 2. It was at this point, according to the officers, that the defendant was "arrested."

 We consider first the argument that the arrest was unlawful. Defendant insists that he was "arrested" when he was stopped in the street; the State argues that the uniformed officers merely "accosted" the defendant as authorized by State v. Lasley, 583 S.W.2d 511, 517–518 (Mo. banc 1979), and other precedents. The State's position is untenable. A person is "under arrest" from the moment a peace officer takes control of his movements. State v. Mallett, 542 S.W.2d 584, 586 (Mo.App.1976). Within minutes after he was stopped, defendant was surrounded by six armed police officers; no reasonable person could have entertained the faintest notion, much less a belief, that he was free to depart. In our

opinion, Kimball was "under arrest" at the time he was stopped. Further in our opinion, the arrest was entirely lawful.

■ The defendant's argument that the officers were not sure who was in the vehicle and therefore the arrest was unlawful is misplaced in the circumstances. The officers were acting on information received from an informer. We have recited the facts at tedious length precisely to show that the officers had corroborated that information in considerable detail. " ... As long as the corroboration of the information through other sources, even though the matters are innocuous, reduces the chances of a 'reckless or prevaricating tale,' the information, even though hearsay, may form the basis of probable cause for an arrest." *State v. Moore, supra,* 580 S.W.2d at 749; *State v. Wiley, supra,* 522 S.W.2d at 288[12]. Here, the information provided by the informer was specific. It was corroborated by independent sources and by the development of events as the informer had predicted. Manifestly, the officers had probable cause to arrest the defendant when they did.

The lawful nature of the arrest has been considered and discussed because such consideration is necessary to an orderly disposition of the appeal. The search and seizure of Exhibits 1, 2 and 4 need not be justified as incident to a lawful arrest. We conclude the search of the automobile and the seizure of those exhibits was justified under the "automobile exception" to the warrant requirement of the Fourth Amendment.

Traditionally, warrantless searches of automobiles and other vehicles have been upheld when probable cause exists and the search is conducted in exigent circumstances.[3] " ... There are essentially two reasons for [a] distinction between automobiles and other private property. First, as [this] Court repeatedly has recognized, the inherent mobility of automobiles often makes it

impracticable to obtain a warrant.... In addition, the configuration, use, and regulation of automobiles often may dilute the reasonable expectation of privacy that exists with respect to differently situated property. ..." *Arkansas v. Sanders,* 442 U.S. 753, 761, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235, 243 (1979).

The court is well aware that the scope of the "automobile exception" has been diminished. Our Supreme Court has recognized that a person not the owner of an automobile may nevertheless have a possessory right in the vehicle which gives him a reasonable expectation of privacy therein and confers "standing" to object to a warrantless search of the vehicle. *In re J. R. M.,* 487 S.W.2d 502, 508–509[2][3] (Mo.banc 1972). More recently, the Supreme Court of the United States has held that the exigent circumstances which justify a warrantless search of a vehicle may not justify the warrantless search of a repository of personal effects found in the vehicle. *Arkansas v. Sanders, supra,* 442 U.S. at 759–761, 99 S.Ct. at 2590–2591[3, 4], 61 L.Ed.2d at 242–243; *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). In *Sanders, supra,* the court recognized that there may be special exigencies—such as reasonable cause to believe the luggage contains a weapon—which justify warrantless searches of both the automobile and a repository of personal effects found therein. *Sanders, supra,* 442 U.S. at 763 n. 11, 99 S.Ct. at 2593 n. 11, 61 L.Ed.2d at 245 n. 11.

■ In this case, we have no difficulty whatever in finding exigent circumstances justifying search for and seizure of State's exhibits 1 and 2. In the circumstances we have set out in detail, the officers had probable cause to believe that two of the occupants of the Plymouth were escaped convicts in possession of a sawed-off shotgun. They therefore had probable cause to search the vehicle. *United States v. Bryant,* 580 F.2d 812, 813[1][2] (5th Cir. 1978); *United*

---

3. Project: Tenth Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1979–1980, 69 Geo.L.J. 211, 238–239 (1980), *Chambers v. Maroney,* 399 U.S. 42, 48–52, 90 S.Ct. 1975, 1979–1981, 26 L.Ed.2d 419, 426–428 (1970); *State v. Achter,* 512 S.W.2d 894 (Mo.App.1974); Miles and Wefing, The Automobile Search and the Fourth Amendment: A Troubled Relationship, 4 Seton Hall L.Rev. 105 (1972).

*States v. McShane,* 462 F.2d 5, 6 (9th Cir. 1972). The United States Court of Appeals for the Seventh Circuit considered a factually similar situation in *United States v. White,* 607 F.2d 203 (7th Cir. 1979). In *White,* the arresting officers had reason to believe the defendant had either secreted a loaded pistol in his automobile or had thrown it out of the car shortly before it was stopped. When the defendant stepped out of his automobile he was wearing an empty shoulder holster. The officers searched the car and found a locked briefcase. They managed to open the briefcase and found a revolver concealed therein. On appeal the defendant contended the search was unlawful. Noting the limitations imposed by *Sanders, supra,* the court held the search and seizure was lawful. The rationale of the decision was, 607 F.2d at 208:

> "The agents had the right and duty to avert possible danger to themselves and the public by finding and holding the gun. The most expeditious way to go about finding it was to search the limited area of the automobile before expanding the search to other areas. . . . The need to locate and take possession of a dangerous instrumentality was an exigent circumstance which justified the warrantless search. . . ."

The court held the motion to suppress was properly denied. In the case before us, the information upon which the officers acted was more detailed and specific than the information held to justify a warrantless search in *Bryant, supra,* and *White, supra.* The motion to suppress State's exhibits 1 and 2 was properly denied.

This leaves the question whether State's exhibit 4—defendant's wallet—was lawfully searched. The search was conducted before *Sanders* was handed down but after *Chadwick* was decided in 1977. Our concern, of course, is not the seizure but the warrantless search. Defendant's wallet was too small to contain a weapon; once

Officer Gann seized it, there was little likelihood it would be moved. Certainly a wallet must be regarded as a repository of personal effects.

We believe the search of defendant's wallet was justified in the peculiar circumstances. We find nothing in the precedents to justify the proposition that one must assert his right to privacy in his personal effects—at the time of search—to avoid a warrantless search; nevertheless, it seems fair to say, at the moment, that an individual person has no reasonable expectation of privacy in a repository for personal effects which belongs to another unless he has some control over that repository. *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980) (briefcase); *Rawlings v. Kentucky,* 448 U.S. 98, 104–105, 100 S.Ct. 2556, 2561[1], 65 L.Ed.2d 633, 641–642 (1980) (semble; plurality opinion) (female companion's purse).[4] There is ample authority, as we have noted, that the arresting officers were entitled to act on reasonable appearances and inferences drawn from the information they had.

In this case, the arresting officer "approached the [Plymouth]" and asked the driver [defendant] for his driver's license. The defendant then volunteered ". . . that he had left his wallet at home." When the defendant stepped out of the Plymouth onto the street, the defendant had a "buck knife and a scabbard" on his belt. The knife resembled a knife taken in one of the robberies under investigation. The officers also had reason to believe defendant and his female companion had other stolen merchandise in their possession. The officers were justified in acting on the assumption the wallet did not belong to the defendant, but might constitute evidence of a crime. In point of fact, there was no substantial question concerning defendant's identity upon the trial of this case, and we think it could well be held that any infringement of

---

4. We attach this cautionary signal because of the Court's ruling—by a majority—that ". . . When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" *Marks v. United States,* 430 U.S 188, 193, 97 S.Ct. 990, 993[4], 51 L.Ed.2d 260, 266 (1977).

defendant's Fourth Amendment rights was harmless error. Nevertheless, we find Officer Gann's search of Exhibit 4 entirely lawful.

The other point briefed and argued concerns the voluntary nature of oral and written statements made by the defendant after he was taken in custody. Parts of these statements were admitted in evidence upon trial after a suppression hearing and over timely objection specifically renewed.

The first aspect of this point is that the statements were inadmissible because they were the product of an unlawful arrest. We have already concluded that the arrest was based on probable cause and was completely lawful. This contention is rejected.

Another argument advanced is that the statements were inadmissible because they were obtained in violation of the Fifth and Fourteenth Amendment rights addressed and discussed in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *State v. Kelly*, 439 S.W.2d 487, 488–489 (Mo.1969). Both those cases held, as defendant suggests, that a criminal suspect's Fifth Amendment right to terminate custodial interrogation, prior to or during questioning, must be scrupulously honored. Defendant claims that the arresting officers continued to interrogate him after he had been taken in custody and had expressed a desire to remain silent. Therefore, he argues, the inculpatory statements he made were the product of compulsion and were inadmissible.

As indicated, we believe the defendant was effectively in custody—"under arrest" —almost from the time the Plymouth was stopped in the street. As soon as the officers discovered the "identification" in defendant's wallet, he was put in manacle and officer John E. Smith "verbally" advised defendant of "his rights." The record indicates that defendant was taken in custody at 7 p. m. on December 9, 1978.

The defendant was then taken to the headquarters of the Springfield Police Department. He was "booked" and one of the officers asked defendant if he "wanted to talk." Defendant said he did not or, ac-

cording to one officer, "not at that time." The defendant was then put in a "lineup" and was identified by his victims or by witnesses as perpetrator of several of the crimes under investigation. One of the officers asked the defendant if he knew what was going on; defendant replied that he did. Officer Smith again asked defendant if he "wanted to talk"; defendant replied that he did.

The defendant was thereupon taken to an interrogation room. One of the officers obtained a written *Miranda* waiver; each question was read to the defendant. According to the testimony of the officers, the defendant indicated he understood each question. One of the printed statements which was read to the defendant runs as follows:

> "If you decide to answer questions now with or without a lawyer, you still have the right to stop the questioning at any time, or to stop the questioning for the purpose of consulting a lawyer."

This waiver was read in its entirety to the defendant and was signed at 9:25 p. m., a little more than 2 hours after the defendant was taken in custody.

Invocation of the privilege against self-incrimination does not "... create a *per se* proscription of indefinite duration upon any further questioning by any police officer on any subject, ... [rather, *Miranda* requires the interrogating officers] ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored ...." *Michigan v. Mosley*, 423 U.S. 96, 103–104 and n. 9, 96 S.Ct. 321, 326 and n. 9, 46 L.Ed.2d 313, 321 and n. 9 (1975). In *State v. Taylor*, 559 S.W.2d 35 (Mo.App. 1977), our colleagues at St. Louis considered a very similar claim of error in a similar factual situation. The authorities were reviewed. The court concluded that if an accused in custody decides to remain silent, the law does not prohibit him from changing his mind. If he can change his mind, the [officers] are entitled to ask him if he has done so. They cannot attempt to persuade him to do so and they may not contin-

ue to question him after he claims his rights. *State v. Taylor, supra,* 559 S.W.2d at 37. In this case, as in *Taylor,* the record falls far short of establishing any order of compulsion because of renewed questioning after defendant initially invoked his right to remain silent.

 Counsel has carried this argument a step further. Citing us to *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the defendant claims his inculpatory statements were coerced because they were induced by implied threats to prosecute his wife's brothers if he did not confess. The primary thrust of the *Innis* opinion is that the Fifth and Fourteenth Amendment rights expounded in *Miranda* may be infringed by techniques of persuasion which fall short of express questioning. Counsel has cited no authority for the proposition that *Innis* should be applied retroactively, but we need not look to *Innis* for authority that a coerced confession is inadmissible. The Fifth Amendment proscribes any confession exacted by improper influence. *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); *State v. Flowers,* 592 S.W.2d 167, 169 (Mo.banc 1979); *State v. Pollock,* 603 S.W.2d 614, 618 (Mo. App.1980).

The defendant's wife had at least three brothers—Mike, Bill (Billy) and Jim (Jimmie) Hamilton. At the suppression hearing, defendant testified that after he had been put in a lineup and before he confessed, Detective Smith told him, "We have your brother, Mike,—your brother-in-law, Mike, and Bill in custody right now, and Jimmie's coming in." Defendant said "So?". Smith replied, "Well, if you want them to be released, you'll come up and cooperate with us and give me a confession." This evidence was contradicted by Detective Smith, defendant's principal interrogator. Smith was asked: "—Do you recall telling [the defendant] . . . 'If you want [your] brothers to be released, you'd better straighten up and cooperate....'?" Smith answered, "No, sir." In general terms, both the officers who participated in defendant's interrogation denied making any threat and denied any order of intimidation or coercion.

 An adjudication of voluntariness requires application of a "totality of the circumstances" test, *State v. Flowers, supra,* 592 S.W.2d at 168, but in light of the officers' very narrow definition of "arrest" and the Hamilton brothers' inarticulacy, a summary of the record testimony would shed little or no light upon the exercise vel non of improper influence. At least two of the Hamilton brothers were taken in custody and were released. The other may have appeared voluntarily; he may have been taken in custody. Discussion of details would serve no useful purpose. We are obliged to consider the age, experience and intelligence of the accused; other general factors having a bearing are the sex of the accused, his [or her] lack of education, infirmity, and unusual susceptibility to coercion. *State v. Flowers, supra,* 592 S.W.2d at 169.

The defendant was a male about 26 years of age at the time he was arrested on December 9, 1978. For several years his record had been one of conviction, escape and return to the conviction of further crime. He had a high school education. If he was subject to any physical infirmity, it does not appear of record. Defendant married the Hamilton brothers' sister on November 27, 1978; his family ties to the Hamilton brothers were of very brief duration.

The only record circumstance of consequence is defendant's testimony that he ingested a number of analgesic tablets containing codeine before he left the Atlantic Street address on December 9. The defendant testified that at the time he confessed, he "felt that narcotic feeling . . . . Laid back." Several of the investigating officers with experience in dealing with narcotics cases testified defendant's appearance differed markedly from the appearance of narcotics users. They gave as their opinion that defendant was not under the influence of any drug when he waived his *Miranda* right and confessed.

 The fact that a criminal defendant's confession is prompted by a desire to

shield a relative from the rigors of arrest, interrogation and confinement does not of itself render his confession involuntary; he may "take the blame," as it were, to exculpate someone else. *United States v. Mullens,* 536 F.2d 997, 1000 (2d Cir. 1976); *Vogt v. United States,* 156 F.2d 308, 312[14] (5th Cir. 1946); Cf. *State v. Olinghouse,* 605 S.W.2d 58, 67[9] (Mo.banc 1980). A confession obtained from one addicted to, or under the influence of drugs is not necessarily involuntary. *United States v. Smith,* 608 F.2d 1011, 1012–1013[3] (4th Cir. 1979) (confession voluntary even though defendant under influence of alcohol); *United States v. Poole,* 495 F.2d 115 (D.C.Cir.1974) (defendant undergoing heroin withdrawal symptoms); *State v. Gordon,* 387 A.2d 611 (Me.1978) (defendant had had two "hits" of L.S.D. some time prior to confession); *Schultz v. State,* 82 Wis.2d 737, 264 N.W.2d 245 (1978) (ingestion of near-fatal dose of aspirin did not render confession involuntary). Upon the record presented, the exercise of coercive influence was a matter of fact for the trial court. *State v. Pollock, supra,* 603 S.W.2d at 619. Cf. *State v. Alewine,* 474 S.W.2d 848, 852–853[4] (Mo. 1971). The trial court found that the defendant knowingly and intelligently waived his *Miranda* rights and that his inculpatory statements were voluntarily made. There is ample record basis for such a finding by a preponderance of the evidence.

To sum up, we hold: The State made proof of every element of the crime charged sufficient to convince any rational trier of fact beyond a reasonable doubt; the defendant's Fourth, Fifth, Sixth and Fourteenth Amendment rights were not infringed in any respect briefed or argued in this court. We perceive no plain error. The judgment is affirmed.

All concur.