STATE of Missouri, Respondent,

v.

Mark ROGERS, Appellant.

No. WD 34596.

Missouri Court of Appeals,
Western District.

March 27, 1984.

Motion For Rehearing and/or Transfer to
Supreme Court Overruled and Denied
May 29, 1984.

Application For Transfer Sustained
July 17, 1984.

Retransferred Jan. 29, 1985.

Court of Appeals Opinion Readopted
Feb. 6, 1985.

James W. Fletcher, Public Defender, Sean D. O'Brien, Asst. Public Defender, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Carrie Francke, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., and NUGENT and MANFORD, JJ.

MANFORD, Judge.

This is a direct appeal from a jury conviction for murder, first degree, in violation of § 565.003, RSMo 1978. The judgment is affirmed.

Appellant presents three points, which in summary charge that the trial court erred in (1) admitting, over objection, appellant's statements to police, because said statements were secured after the police failed to scrupulously honor his assertion to remain silent; (2) failing to instruct the jury on murder, second degree; and (3) denying his motion for new trial because of juror misconduct.

There being no direct challenge to the sufficiency of the evidence to sustain appellant's conviction, a summary of the pertinent facts suffices.

The location of this murder was the One Stop Liquor Store at 291 Highway and Courtney Road in Sugar Creek, Missouri. At about 6:30 p.m. on November 27, 1979, one Deborah Ward, a regular customer of the store, purchased some items. As she left, she observed three long-haired white males in a dark blue station wagon. (Later, at trial, she testified that the three acted suspicious, as if they intended to rob the store. Ward thought one of the trio looked like appellant.) The One Stop store was owned and operated by Pat Short and her husband, Marvin "Lou" Short. The store contained a living area in the rear. At about 8:30 p.m. on November 27, 1979, someone entered the store and Marvin "Lou" Short went to the front portion of the store. Moments later, Pat Short heard her husband say, "Don't do it. It's not worth it." Pat Short then heard a young man reply, "I need the bread man." Realizing something was wrong, Pat Short proceeded to look for a weapon in the back room. She heard a "pop", turned, and saw her husband on the floor. She called the police and then ran next door for help. Upon her return, she went to her husband, who died while she was holding him. Marvin "Lou" Short died as a result of a fatal shotgun wound.

On December 1, 1979, a robbery involving the use of a shotgun was reported to police. A Metro Squad Unit homicide detective, Clarence Luther, responded to the call. Luther secured a description of the vehicle used and later stopped this vehicle, then being operated by appellant. When stopped, this vehicle was occupied by appellant, two small children, Steven Johnson,

Mark Fletcher, and Gaye Handley. The vehicle was heavily damaged, including the trunk area. Because of the damage, Luther could see into the trunk area where he observed a single-barrel .12 gauge shotgun. Inside the vehicle were several live .12 gauge shells and one spent shell casing. At this time, Luther arrested appellant. A search of appellant's person produced additional live .12 gauge shells.

Later, on December 1, 1979, appellant was given his *Miranda* warning and asked about the Short murder. Appellant denied that he murdered Short. On December 4, 1979, appellant was again given his *Miranda* warning and again was asked by Luther about the Short murder. In talking with Luther, appellant stated that he did not intend to kill anyone. At this point, appellant stated that he did not want to talk anymore and that he wanted "to take his chances with a jury" or words to that effect. Luther terminated the inquiry.

Two other detectives, Herb Soule and Stanley Love, were assigned to return appellant to the Jackson County jail. While handcuffing appellant, Soule told appellant that he (Soule) had heard that appellant would rather take his chances with a jury than to discuss the matter. Love asked appellant if that was what appellant had previously stated. Appellant responded affirmatively "at the present time." Soule then asked appellant if appellant still felt that way. Appellant appeared to hesitate. Soule then asked appellant if he (appellant) wanted to know "what he was up against." Appellant answered, "Yes, I do", and Soule then read a portion of the Missouri capital murder statute to appellant. Appellant then advised Soule that he wanted to talk to him. Soule told appellant that he (appellant) did not have to talk to him (Soule) and Soule again gave appellant his *Miranda* warning. After signing a written waiver of his rights, appellant gave Soule a statement about the robbery and murder of Marvin "Lou" Short.

In summary, appellant's written statement disclosed that on November 27, 1979, appellant picked up Steven Johnson in a black two-door Fairlane. Appellant and Johnson drove to a wooded area where Johnson had hidden a .12 gauge shotgun. The two drove around discussing, a robbery to obtain monies to buy drugs.[1] Johnson mentioned that he had seen "an old man" in a liquor store. The two discussed the robbery of the One Stop Liquor Store. The two entered the One Stop Liquor Store, with appellant pointing a shotgun at Marvin "Lou" Short. Appellant stated to Short, "Give me all your money." Short gave appellant money from his pockets and appellant demanded money from the cash register. At that moment, appellant's attention was directed to his accomplice, Johnson, and as appellant again turned to see the victim Short, the victim was pulling out a handgun. Appellant then murdered Short with the shotgun. Appellant and Johnson fled the scene.

On December 5, 1979, Officer Luther, after learning that appellant had given a written statement to Officer Soule, contacted appellant. Again, Luther gave appellant his *Miranda* warning and asked appellant about minor discrepancies in his (appellant's) statement.

Appellant's statements, oral and written, were the subject of a pre-trial motion to suppress. After a full hearing, the trial court overruled the pre-trial motion. At trial, both the oral and written statements of appellant were, over objection, admitted into evidence. Appellant testified on his own behalf, denying any involvement in the Short murder, and testified that he gave both the oral and written statements, because he was tired of being transferred from one jail to another and he wanted to contact his family. Appellant's defense was alibi, in being at the home of his parents at the time the murder was committed. The jury returned its verdict. A hearing was held on appellant's motion for new trial and that motion was overruled. Judg-

---

1. The investigation had revealed that appellant is a drug addict and in his statement, he dis-

closed using drugs on the morning of November 27, 1979.

ment and sentence was entered. This appeal followed.

Turning to appellant's point (1), it is found that appellant charges that the trial court erred in admitting his statements to police, over objection, because said statements were secured after police officers failed to "scrupulously honor" his assertion of his fifth amendment rights.

Appellant's point (1) fails because the record does not support his claim that his fifth amendment rights were not "scrupulously honored." The evidence clearly reveals that appellant "initiated" the second conversation relative to the Short murder. The following evidence reveals this for the court:

"Q. Would you tell the Court what that conversation was?

A. I was preparing to take him out of the cell. As a matter of fact, I did remove him from the detention cell and handcuffed him—or started to handcuff him and told Mr. Rogers that I was of the understanding that he had stated he would rather take his chances with a jury than talk to us. And I asked him if he was sure that was what he wanted to do...

Q. And when you asked him that, what was his reply?

A. Well, he kind of hesitated, first, and didn't make any reply. And then I asked him if he wanted to know what he was up against.

Q. And what did he do when you asked him that question?

A. He said, 'Yes, I do.'

Q. And then what did you do?

A. I instructed one of the officers that was standing there to go and bring me a copy of the Missouri Revised Statutes book.

Q. And did you get that copy?

A. I did, sir.

Q. And what did you do with that statute book?

A. I opened the statute book to the capital murder section and read the criteria in that section to Mr. Rogers and explained to him that that was the very worst classification of crime that he could be charged with, that at a jury's option it could go from there to acquittal or anyplace in between...

Q. And, again, why was it that you read him that statute?

A. Because the man indicated his desire to know what he was up against...

Q. After you read him the statute, did he make any statements to you in regards to whether or not he wanted to make a statement?

A. Yes, sir, he did.

Q. And what did he say?

A. He said he would like to talk to me...

Q. Now, once he told you that he wished to talk with you, what did you do?

A. I took him into the office belonging to the chief of police and advised him of his Miranda warning...

Q. When you went into the office and you read him his rights, did you read that to him orally?

A. I gave him a recitation of it. I didn't read it from anything.

Q. Did you tell him anything else after you read him his rights?

A. Yes, sir. I told him that if he wanted to talk to us about it he would have the option of whether we wrote anything down or whether he just talked to us and we didn't write anything down.

Q. Did you tell him that he didn't have to talk with you?

A. Yes, sir. I told him that several different occasions, at different times during the evening.

Q. Did you ever specifically tell him he didn't have to talk with you, after the situation in the holding area, where you read him the statute?

A. Yes, sir. I told him that at the initial advisement of the Miranda.

Q. And did you tell him that before you asked him any questions?

A. Yes, sir, I did."

The record further reveals that by appellant's own testimony, he understood and voluntarily waived his rights after he initiated the conversation with Officer Soule and prior to his giving the confession. The record reveals the following:

"Q. Now, you heard the officer say that before you gave the written statement they told you you didn't have to make a statement. Did they tell you that?

A. Yes.

Q. They did tell you you didn't have to make that statement?

A. Yes.

Q. And that was after they had given you a Miranda, orally, isn't that right?

A. Yes.

Q. And after they gave you your Miranda rights that are contained in one full page on State's Exhibit No. 4. is that right?

A. Yes."

The record further reveals that during the initial interrogation (on December 1, 1979) by Officer Luther, appellant was first given his *Miranda* warning. Appellant signed a written waiver. During this interrogation, appellant orally stated, "I didn't mean to kill him." At this point, appellant advised Luther that he did not wish to talk further and stated that he would take his chances with a jury. Luther terminated the interrogation.

While being prepared for the return to the county jail, another officer (Soule) told appellant that he had heard that appellant would rather take his chances with a jury than discuss the matter. Appellant hesitated, and Soule asked appellant if he knew what he was up against and if he wanted to know. Appellant said yes. Soule read portions of the Missouri capital murder statute to appellant. Appellant told Soule that he would talk to him, did so, and in fact gave Soule a written confession describing in detail how the murder occurred. It was appellant and not the officer who initiated the subsequent discussion of the Short murder.

Before giving the written statement to Soule, appellant was advised that he did not have to talk to Soule. Soule also gave appellant his *Miranda* warning and appellant again signed a written waiver of his rights contained on the first page of his written statement. The record reveals that at no time was appellant ever threatened or coerced. No request for counsel was ever made by appellant.

Appellant's contention that the reading of portions of the Missouri capital murder statute amounted to "coercion" of appellant is nothing more than a conclusion not supported by the facts upon the record. The record reveals Soule told appellant that he (Soule) had learned that appellant desired to take his chances with a jury rather than discuss the matter. Appellant was hesitant in response to Soule's statement. Soule then asked if appellant "knew what he was up against" and if appellant wanted to know what that was, to which appellant answered yes. This led to a reading of the Missouri law by Soule. There was no mention by Soule or anyone else of appellant giving a statement. At this point, appellant told Soule he wanted to talk to him. Soule repeatedly told appellant that appellant did not have to talk to him. Appellant was again given his *Miranda* warning, and signed a written waiver. No offers or promises were made to appellant.

█ The record reveals that from the whole of the record, appellant's rights were "scrupulously honored" as mandated by *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975), in following the rule announced in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

█ As noted in *Mosely*, the rule in *Miranda* does not prohibit subsequent interrogation of an accused. Nor does *Mosely* *require* that the subsequent interrogation be upon or regard an offense which was *not* the subject of the original interrogation. See also *State v. Royal*, 610 S.W.2d 946, 948 (Mo. banc 1981). Such a ridiculous suggestion is one that has been engrafted onto *Mosely* by the dissent herein. The court in *Mosely*, after explaining that sub-

sequent interrogation is permissible if the rights of the accused are otherwise protected, then emphasized that rule by pointing out that Mosely was interrogated about a different and unrelated criminal act.

■ The entire question presented in *Mosely* is not even present in the instant case, because the record herein clearly reveals that appellant, and not law enforcement officers, initiated subsequent or further discussion surrounding the Short murder. What the record before this court reveals is that this case comes within the rule recently restated in *United States v. Hackley*, 636 F.2d 493, 499 (D.C.App.1980) which states, "[E]ven though a defendant invokes the right to be silent, this invocation may also be revoked or waived. *United States v. Rooks*, 577 F.2d 33, 37 (8th Cir.1978), cert denied 439 U.S. 862 [99 S.Ct. 183, 58 L.Ed.2d 171] ..." Appellant herein told Officer Soule that he wanted to talk to him. The instant case more clearly comes within the rule of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *See also United States v. Bentley*, 726 F.2d 1124 (1984).

It should be noted at this point that there is absolutely no evidence of any coercion of appellant to make the statement. Appellant's actions herein are analogous to the defendant in *State v. Olds*, 603 S.W.2d 501 (Mo. banc 1980). See also *State v. Taylor*, 559 S.W.2d 35, 37 (Mo.App.1977) and *State v. Kimball*, 613 S.W.2d 932, 941 (Mo.App. 1981).

■ Perhaps just as applicable at this point is the further rule that the constitutional rights of an accused are premised upon whether any inculpatory statement has been given voluntarily, and our courts "[i]n such circumstances must look to the totality of the circumstances surrounding the admission of the statement to determine if it was made voluntarily, *Boulden v. Holman*, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139, 22 L.Ed.2d 433 (1969); *United States v. Harden*, 480 F.2d 649, 650 (8th Cir. 1973)." *Hackley* at 499. See also *Kimball* at 942.

■ In cases where the admission of an inculpatory statement was voluntarily made, the state bears the burden of proving it was voluntarily given. *State v. Campbell*, 612 S.W.2d 371 (Mo.App.1980). The state in the instant case carried that burden.

■ If the above-referred-to portion of the record does not, in the minds of some, completely refute that appellant was properly afforded his *Miranda* warning, then perhaps the following rule will further aid the determination of the question. It has been held, "Further, with regard to the second interrogation, *Miranda* warnings need not be given each time the accused is questioned. *Miller v. United States*, 396 F.2d 492 (8th Cir.1968), cert. denied, 393 U.S. 1031 [89 S.Ct. 643, 21 L.Ed.2d 574] (1969)..." *State v. Woodward*, 587 S.W.2d 287, 289 (Mo.App.1979). See also *State v. Brockman*, 634 S.W.2d 575, 577 (Mo.App.1982); *State v. Brown*, 601 S.W.2d 311, 313 (Mo.App.1980); and *Joyce v. State*, 637 S.W.2d 386, 387 (Mo.App. 1982).

■ As noted above, the evidence upon the instant record reveals that appellant initiated the subsequent or further discussion of the Short murder which led to his execution of a written confession. Assume for the moment and simply for the sake of discussion that the conversation between appellant, Soule and Love was a "special circumstance" which led to his "involuntary confession", appellant could still not prevail because it was incumbent upon appellant to have presented evidence supporting such a contention. *State v. Ross*, 606 S.W.2d 416, 425 (Mo.App.1980). At trial, appellant never made such an assertion or offer *any* evidence of any "special circumstances."

From the record, it is clear exactly what occurred. Appellant was first interrogated by Officer Luther, during which appellant refused to continue the conversation. Luther terminated the interrogation. Later, Officers Soule and Love mentioned to appellant that they heard appellant had cho-

sen to take his chances with a jury. These officers then asked appellant if he was aware of "what he was up against and would he like to know." Appellant advised these officers that he would like to know, and in response, the officers read a portion of the Missouri capital murder statute. At this point, appellant freely and voluntarily told Officer Soule that he wished to talk further with the officer. This latter action by appellant led to his signing a confession. At trial, appellant, by his own testimony, does not even challenge or refute the events testified to by Soule and Love.

What is obvious from this record is the challenge (by a pre-trial motion to suppress) by appellant to a statement voluntarily given by appellant, which contained obvious inculpatory statements concerning his direct participation in the murder. The record clearly reveals this challenge to be nothing more than an afterthought in preparation for trial.

■ As a part of his argument under his point (1), appellant further contends that his statements were inadmissible because the police knew he was a drug addict. This contention is as groundless as appellant's contention that his rights were not "scrupulously honored" because by appellant's own testimony, it is shown that he was not, at the time he gave his statements, under the influence of drugs. There is no evidence that appellant's ability to comprehend and understand was impaired. Assuming arguendo that appellant had been under the influence of drugs, that factor alone would not necessarily render appellant's statements involuntarily. *United States v. Smith*, 608 F.2d 1011 (4th Cir. 1979).

There is absolutely no evidence upon the record herein that Sgt. Soule "undercut" defendant Rogers "previous decision not to answer." That statement by the dissent is without any basis in fact.

■ In summary, point (1) is ruled against appellant because the evidence upon the record herein clearly and without contradiction reveals that appellant volun-

tarily initiated the subsequent or further discussion concerning the Short murder. The record reveals that appellant did so by his request to talk further with Sgt. Soule after appellant, Soule and Love discussed "what appellant was up against." As also noted, there is no evidence of coercion or impairment of appellant's ability to comprehend or act. The simple fact is that the rules in *Miranda, Mosely,* and other authority cited herein were adhered to and appellant's rights to remain silent were at all times "scrupulously honored."

Appellant's point (1) is meritless and is ruled against him.

Under his point (2), appellant charges that the trial court erred in failing to submit to the jury an instruction on murder, second degree, MAI–CR2d 15.14.

The record reveals that the trial court submitted proper instructions on first degree felony murder and manslaughter. The record is equally as clear that there is no evidence upon the record to support the submission of an instruction upon murder, second degree.

What the evidence does show is that appellant and Johnson entered the One Stop Liquor Store for the express purpose of committing an armed robbery to secure monies to support a drug habit. During the commission of the robbery, appellant murdered the victim, Marvin "Lou" Short. Since appellant offered an alibi defense, the only evidence regarding any charge of murder was that which supported the offense of felony murder, first degree, and not murder, second degree.

■ An instruction on murder, second degree, even if such offense is an offense included in murder, first degree, is not required in every murder first degree case and an instruction on murder, second degree, is required only if "justified by the evidence." *State v. Pettis*, 655 S.W.2d 513 (Mo. banc 1983).

■ Appellant's reliance upon *State v. Donovan*, 631 S.W.2d 39 (Mo.1982) is misplaced because unlike *Donovan*, the evidence herein is an unequivocal account of

the commission of a murder during and as part of the commission of another felony, to commit armed robbery. See *State v. Olds, supra.*

Appellant's point (2) is meritless and is ruled against him.

Under his final point (3), appellant charges that the trial court erred in overruling his motion for new trial because of juror misconduct.

A full hearing on appellant's post-trial motion was held by the trial court. Two jurors were called and testified. Juror Powell testified that during jury deliberations, she told the other jurors that Steven Johnson had pleaded guilty to the same offense and had been sentenced. Juror Miller testified that she was told about Johnson and that it influenced her decision to change her vote from not guilty to guilty. The trial court ordered the testimony of these jurors stricken upon the prosecution's motion that said juror testimony was offered for the purpose of impeaching the verdict. The trial court then overruled appellant's motion for new trial.

Appellant's reliance upon § 547.020, RSMo 1978 goes wanting for the lack of any evidentiary basis to support the application of that statute.

The record herein reveals references to Johnson during the course of trial. In addition, Juror Powell could not and did not testify at the post-trial hearing as to where she obtained the information concerning Johnson. This jury was never separated. There is no evidence that Juror Powell obtained this information from any improper source or that any impropriety arose relative to her having obtained such information.

What the record reveals is, because of the absence of any evidentiary basis as to the source of Juror Powell's information concerning Johnson, an attempt by appellant to impeach the jury's verdict. Missouri follows the strict rule prohibiting the impeachment of a verdict by jurors. *State v. Davis,* 529 S.W.2d 10, 15 (Mo.App.1975);

*State v. Foster,* 490 S.W.2d 659 (Mo.App. 1973).

Appellant's reliance upon *State v. Malone,* 333 Mo. 594, 62 S.W.2d 909 (1933) is misguided as *Malone* is clearly distinguishable because the issue in *Malone* was juror misconduct in using a telephone during deliberations and which included the overhearing of improper remarks by other jurors. There is no evidence upon this record to show any juror misconduct.

The granting of a new trial based upon juror misconduct lies within the discretion of the trial court and a ruling thereon will not be disturbed absent an abuse thereof. *Foster, supra; State v. McCall,* 602 S.W.2d 702 (Mo.App.1980). The question of abuse by the trial court does not even arise in the instant case because there is *no* showing of any juror misconduct.

Appellant's final point (3) is meritless and is ruled against him.

Judgment affirmed.

PRITCHARD, P.J., concurs.

NUGENT, J., dissents in a separate dissenting opinion.

NUGENT, Judge, dissenting.

I must dissent. Defendant Rogers' first point on appeal charges that the trial court erred in admitting defendant's inculpatory statements to police. He contends that after he had decided to remain silent the police failed to "scrupulously honor" his right to cut off questioning and thereby obtained the damaging statements.

On December 1, 1979, Detective Clarence Luther arrested defendant, gave him his *Miranda* warnings and questioned him about the murder of Marvin "Lou" Short. Rogers denied committing it. On December 4, Luther again advised the defendant of his constitutional rights and interrogated him about the Short homicide. During that interrogation, defendant told Luther that he would tell the detective all about it in detail and that he did not intend to kill anyone. He then stopped, paused a long

time and then said to Luther, "I don't want to talk anymore," and that he would "take his chances with a jury." Detective Luther honored the defendant's request and stopped the questioning at about 5:00 p.m.

Two other detectives, Sgt. Herb Soule and Stanley Love, were then assigned to take the prisoner to the county jail. Both officers knew that defendant had invoked his Fifth Amendment privilege. While handcuffing him, Sgt. Soule told defendant that he had heard that Rogers "would rather take his chances with a jury than talk to us." Detective Love, having heard that Rogers wanted to take his chances with a jury, asked him if that is what the defendant had said. Rogers replied, "Yes, at the present time." Sgt. Soule then asked Rogers if he was sure that was what he wanted to do. Rogers "kind of hesitated" and made no reply. Noting defendant's hesitation, Soule asked Rogers if he wanted to know "what he was up against," and the defendant said that he did. At that point,[1] Soule read to the defendant a portion of the Missouri capital murder statute, including the death penalty provisions. Defendant then told Soule that he wanted to talk to him. (This exchange lasted only three to five minutes.) The detectives then took the defendant into an office and advised him of his rights; defendant signed a written waiver and began an oral narrative. At about 8:15 p.m., Rogers signed a statement disclosing that he had shot Mr. Short in the course of a robbery.

Defendant's exercise of his right to remain silent is not at issue in this case. Defendant told Detective Luther that "he did not want to talk anymore." Sgt. Soule testified that he told defendant that "he had heard that defendant would rather take his chances with a jury than discuss the matter with us." Detective Love testified that he also had asked Rogers if that was what he had said. That testimony establishes not only that Rogers had invoked his Fifth Amendment privilege, but also that Sgt. Soule and Detective Love were aware of his exercise of that constitutional right.

Without question, Clarence Luther "scrupulously honored" Rogers' "right to cut off questioning." *Michigan v. Mosely*, 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). He had immediately stopped questioning Rogers when the defendant told the officer that he wanted to remain silent.

The only issue is whether defendant's "right to cut off questioning" was "scrupulously honored" by Sgt. *Soule*. *Id.* Whether the trial court erred in admitting defendant's statement turns on the resolution of that issue because under *Miranda* "the admissibility of statements obtained after the person in custody has decided to remain silent depends on whether ' "his right to cut off questioning" ' was ' "scrupulously honored" ' " *Id.*

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court held that when a person in custody indicates that "he wishes to remain silent, the interrogation must cease." *Id.* at 473, 86 S.Ct. at 1627. In 1975, the Court in *Michigan v. Mosely, supra,* held that *Miranda* does not "create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once a person in custody has indicated a desire to remain silent." *Id.* 423 U.S. at 103–04, 96 S.Ct. at 326. The Court further explained that:

A reasonable and faithful interpretation of the *Miranda* opinion must rest on the intention of the Court in that case to adopt 'fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored....' 384 U.S.,

---

1. Detective Love's memory differs from Sgt. Soule's. Love testified as follows regarding Rogers' reaction to Sgt. Soule's comments to the defendant *before* that officer read the capital murder statute: "I think Mr. Rogers volunteered. I think Mr. Rogers made the statement, Is it too late to change my mind?" Sgt. Soule, at the pretrial hearing and at trial, testified, however, that the defendant did not tell the officer that he wanted to talk until after he heard the statute read.

at 479, 86 S.Ct., at 1630. The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' *Id.,* at 474, 86 S.Ct., at 1627. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'

The *Mosley* court explained that police can fail scrupulously to honor the decision of a person to cut off questioning either by "refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105–06, 96 S.Ct. at 327. Finding that the police did neither of the above, the Court held that the defendant's "right to cut off questioning" in that case was fully respected. *Id.* at 104, 96 S.Ct. at 326.

In *Michigan v. Mosley,* defendant Mosley was in custody for robberies. When advised of his *Miranda* rights, Mosley said that he did not want to discuss the robberies. The officer "immediately ceased the interrogation and did not try either to resume the questioning or in any way to persuade Mosley to reconsider his position." *Id.* at 104, 96 S.Ct. at 327. After more than two hours time had elapsed, another police officer questioned Mosley at another location about an unrelated hold up murder. Before that questioning, however, the police officer advised the defendant of his constitutional rights. Based on these facts, the Court held that this was not a case "where the police failed to honor the decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear

down his resistance and make him change his mind." *Id.* at 105–06, 96 S.Ct. at 327.

Obvious factual similarities do indeed exist between this case and *Mosley.* In both cases, the defendants initially had been given *Miranda* warnings, both defendants had invoked their right to remain silent, and in both cases two hours had passed before the defendants were again confronted by police officers. From this point, however, the facts of the two cases differ significantly.

In this case, Sgt. Soule approached the defendant after the two hours had passed and began talking to him without giving him a fresh set of *Miranda* warnings as was done in *Mosley.* Although Sgt. Soule did give defendant Rogers his *Miranda* warnings *after* Rogers stated that he wanted to talk and immediately *before* the defendant confessed, Sgt. Soule did *not* read defendant his rights before he addressed statements and questions to defendant that "undercut" Rogers' "previous decision not to answer" questions concerning the Short murder. *Mosley, supra,* at 105–06, 96 S.Ct. at 327–28.

Another significant difference between this case and *Mosley* is that Sgt. Soule questioned defendant Rogers about the same crime, that is, the Short murder. In *Mosley* the Court repeatedly emphasized the fact that the second interrogation was "restricted ... to a crime that had not been a subject of the earlier interrogation." *Id.* at 106, 96 S.Ct. at 327. And the Court found that the second officer "did not undercut Mosley's previous decision not to answer" the first detective's questions because the second officer's interrogation "focused exclusively on ... a crime different in nature and in time and place of occurrence from the robberies for which Mosley had been arrested and interrogated by" the first officer. *Id.* at 105, 96 S.Ct. at 327.

Sgt. Soule's comments, questions and reading of the statute to the defendant before he re-advised the defendant of his rights *was* an attempt "to persuade ... [defendant] to reconsider his position" and *did* "undercut" defendant Rogers' "previ-

ous decision not to answer" questions about the murder. *Id.* The attempt to persuade is the point of focus. An incriminating statement which is the product of police persuasion of a suspect in custody is, in the words of the Supreme Court, "the product of compulsion, subtle or otherwise." *Miranda v. Arizona, supra,* 384 U.S. at 474, 86 S.Ct. at 1628.

Sgt. Soule testified that while he was handcuffing Rogers he told Rogers that he had heard that the defendant "would rather take his chances with a jury than to talk to us." Then he began to try to persuade the defendant. He asked the defendant whether he was sure that was what he wanted to do. Rogers hesitated but made no reply. During this exchange, Detective Love elicited from Rogers his explicit reiteration of his desire to take his chances with a jury and not to talk. Rather than abandoning such questions at that point, after the defendant exercised his Fifth Amendment privilege by remaining silent and by explicit response to Love, Sgt. Soule "persist[ed] in repeated efforts to wear down his resistance and make him change his mind," *Michigan v. Mosley, supra,* 423 U.S. at 105–06, 96 S.Ct. at 327, by asking the defendant if he wanted to know what he "was up against." The defendant said, "Yes," but that response did not waive his earlier exercise of his privilege to remain silent and right to cut off questioning. Nonetheless, Sgt. Soule read to the defendant the capital murder statute, including the death penalty portion. His purpose could only have been to persuade the defendant to talk and to obtain an incriminating statement from him.

After all of that, the defendant said that he wanted to talk. At that point Sgt. Soule read defendant his rights and obtained a confession. Soule succeeded "by persisting in repeated efforts to wear down [the defendant's] resistance and make him change his mind." *Id.* In doing so, he failed to "scrupulously honor" defendant Rogers' decision to "cut off questioning."

Although Missouri courts have concluded that officers may ask an individual who has invoked his right to remain silent whether he has changed his mind, officers may *not* attempt to *persuade* the individual to do so. Nor may they continue to question him. *State v. Kimball,* 613 S.W.2d 932, 941–42 (Mo.App.1981); *State v. Taylor,* 559 S.W.2d 35, 37 (Mo.App.1977). In both *Kimball* and *Taylor,* the officers advised defendants of their rights and the defendants immediately indicated that they did not wish to talk. The officers asked no questions at that time. In each case, sometime later officers asked the defendant if he wished to talk or make a statement. In response to these single inquiries, the defendants in both cases replied that they *did* want to make a statement. The statements were held to be admissible in those cases; the officers had scrupulously honored the defendants' right to cut off questioning. The defendants were asked only one thing: whether or not they wanted to talk. And after being asked this question one time, the defendants replied that they did want to talk. They were not "repeatedly questioned nor was there any persuasion or inducement to make a statement." *Taylor, supra,* at 37.

This case is distinguishable. Defendant Rogers made no reply when Sgt. Soule asked him whether he was sure he wanted to take his chances with a jury and not talk to the officers. Rogers did not change his mind about talking after a single inquiry as did the defendants in *Kimball* and *Taylor.* Rather, defendant Rogers changed his mind and decided to give a statement only after repeated effort by Sgt. Soule. The officer did not scrupulously honor defendant's right to cut off questioning. *Michigan v. Mosley, supra; Miranda v. Arizona, supra.*

Besides *Kimball* and *Taylor,* the only other Missouri case the majority opinion relies on is *State v. Olds,* 603 S.W.2d 501 (Mo.1980) (en banc). The majority says that Rogers' voluntary agreement to confess was the same as the accused's conduct in *State v. Olds, supra.* In *Olds* the court held that the defendant's recorded statements were admissible because the defend-

ant had voluntarily, knowingly and intelligently waived his *Miranda* rights, but the court did not address the issue whether the officer scrupulously honored the defendant's right to cut off questioning. The court had no need to reach that issue because it found that the defendant's merely indicating his "desire that the tape recorder be turned off is not equivalent to invoking his Fifth Amendment privilege against self incrimination." *Id.* at 507. Thus, *State v. Olds* does not address the issue in this case.

The trial court erred in not suppressing the evidence of defendant's December 4 oral and written confessions to Sgt. Soule and Detective Love and the December 5 reiteration and expansion of those confessions made to Detective Luther growing out of defendant's confessions to Soule and Love.

On this ground alone, the defendant is entitled to a new trial.